## ATLANTIC COAST LINE RAILROAD COMPANY *v.* STANDARD OIL COMPANY OF KENTUCKY.

## STANDARD OIL COMPANY, INCORPORATED IN KENTUCKY, *v.* ATLANTIC COAST LINE RAILROAD COMPANY.

CERTIORARI. TO THE CIRCUIT COURT OF APPEALS FOR THE SIXTH CIRCUIT.

Nos. 176 and 177.   Argued October 4, 1927.—Decided November 28, 1927.

The plaintiff company, engaged in selling oil (viz., gasolene and refined, lubricating and fuel oils) within the State of Florida, had storage tanks on and near the Florida seaboard in which it kept supplies sufficient to meet the demands of its business for considerable

periods in advance, and which it replenished from time to time by fresh supplies purchased by it from other companies. The supplies so purchased were furnished by the vendors from places in the State of Louisiana and in Mexico, respectively; transported by them by sea at their own expense from those places to Florida, and delivered by them in bulk to plaintiff, by pumping from the ships through plaintiff's pipe lines, either directly into plaintiff's storage tanks or (in the case of the lubricating oil) into tank cars leased by plaintiff, in which the oil was moved by rail to its other storage tanks, a few miles distant, and deposited therein. Title passed to the plaintiff on delivery, and settlements with its vendors were made on the basis of the amounts so actually delivered by them, at the market prices in effect at times of delivery, or (in the case of fuel oil) at prices fixed in advance in yearly contracts calling for delivery of specified quantities each month. In the arrangements with the vendors, none of the oil so brought in was designated or intended for any destination in Florida beyond the storage tanks or tank cars into which it was delivered from the ships, and there was neither necessity nor purpose to send any of it through the storage stations to interior points by immediate continuity of movement, although delivery into storage tanks might occur contemporaneously with withdrawal of oil from the same tanks for the purpose of supplying plaintiff's bulk and service stations, and although sales of fuel oil to customers were largely contracted for by plaintiff in advance of shipment of such oil to plaintiff from point of origin.

*Held*, that rail transportation of the oil from the storage tanks to plaintiff's customers in Florida, or to plaintiff's bulk and service stations there from which it was sold to such customers, was intrastate commerce and subject to intrastate rates. P. 267.

16 F. (2d) 441, reversed; 13 *Id.*, 633, affirmed.

CERTIORARI, 273 U. S. 691, to a decree of the Circuit Court of Appeals, which modified a decree of the District Court enjoining the above-named Railroad Company from charging the Oil Company in excess of the intrastate rates for transportation of its products between certain points in Florida, and adjudging that the Oil Company recover the amount of such excess charges already collected.

*Mr. Thomas W. Davis,* with whom *Mr. William Marshall Bullitt* was on the brief, for Atlantic Coast Line Railroad Co.

The application of the rates depends upon the essential character of the commerce and not upon its accidents or isolated incidents. The acts of plaintiff and its customers, in making yearly contracts for petroleum products to be delivered at interior points in Florida, of themselves constitute interstate commerce. *Butler Shoe Co.* v. *U. S. Rubber Co.,* 156 Fed. 1; *Internat'l Book Co.* v. *Pigg,* 217 U. S. 91; *Flanagan* v. *Fed. Coal Co.,* 267 U. S. 222; *Spalding & Bros.* v. *Edwards,* 262 U. S. 66; *Lemke* v. *Farmers Grain Co.,* 258 U. S. 50; *Dahnke-Walker Co.* v. *Bondurant,* 257 U. S. 282; *Shafer* v. *Farmers Co.,* 268 U. S. 189.

The question of where title passes is of no materiality; but the intention of the parties, as shown throughout their course of business, governs. *Penna. R. R.* v. *Clark Bros. Co.,* 258 U. S. 456; *Stafford* v. *Wallace,* 258 U. S. 495; *Sou. Pac. Term. Co.* v. *I. C. C.,* 219 U. S. 498; *Swift & Co.* v. *U. S.,* 196 U. S. 375; *B. & O. S. W. R. R.* v. *Settle,* 260 U. S. 166.

The movement of lubricating oil from Port Tampa, and of lubricating oil, gasoline, and kerosene from Jacksonville, are both interstate commerce and the reasoning of the Circuit Court of Appeals to the contrary is erroneous, because it makes the character of those movements to the interior depend not upon their intrinsic nature, but upon the amount of the small percentage sold locally. *Western Oil Co.* v. *Lipscomb,* 244 U. S. 346; *R. R. Comm.* v. *Worthington,* 225 U. S. 101; *Peoples Gas Co.* v. *Pub. Ser. Comm. of Penna.,* 270 U. S. 550; *Binderup* v. *Pathe Exchange,* 263 U. S. 291; *Douglas* v. *Southern Ry. Co.,* 216 Ill. App. 148.

Decisions of the Interstate Commerce Commission: *Tampa Fuel Co.* v. *A. C. L. R. R.,* 43 I. C. C. 231; *Internat'l Agr. Corp.* v. *Director General,* 60 I. C. C. 726;

*Alexander Grocery Co.* v. *Beaumont, etc. Ry. Co.,* 104 I. C..C. 155.

Cases distinguished: *Sonneborn* v. *Keeling,* 262 U. S. 506; *Penna. R. R.* v. *Clark Bros.,* 238 U. S. 506; *Sou. Pac. Co.* v. *Arizona,* 249 U. S. 472; *Arkadelphia Co.* v. *S. L. & S. W. Ry.,* 249 U. S. 134; *Penna. R. R.* v. *Knight,* 192 U. S. 21; *Gulf, Colo. & S. F. Ry.* v. *Texas,* 204 U. S. 403.

Oil cases from North Carolina and Florida: *Atl..Coast Line* v. *Std. Oil Co.,* 12.F. (2d) 541; *State* v. *Seaboard etc. Ry. and Atl. Coast Line,* 109 Sou. 656; *Hamilton Co.* v. *Wolff,* 240 U. S. 258; *Hughes Bros. Co.* v. *Minnesota,* 272 U. S. 469.

*Mr. Charles G. Middleton,* with whom *Messrs. Edward P. Humphrey* and *William W. Crawford* were on the brief, for the Standard Oil Company of Kentucky.

The business in Florida is local and intrastate rates should be applied to the transportation necessary to serve it. *Atl. Coast Line R.* v. *Std. Oil Co.,* 12 F. (2d) 541, certiorari denied, 273 U. S. 712; *Std. Oil Co.* v. *Atl. Coast Line,* 6 F. (2d) 911; *Seaboard etc. Ry.* v. *Florida,* 109 Sou. 656, certiorari granted, 273 U. S. 691.

When products are unloaded, stored and mixed with other property in the State, interstate commerce is ended for all purposes. *General Oil Co.* v. *Crain,* 209 U. S. 211; *Texas Co.* v. *Brown,* 258 U. S. 466; *Sonneborn Bros.* v. *Cureton,* 262 U. S. 506.

The business of supplying on demand local consumers, is a local business. *Pub. Util. Comm.* v. *Landon,* 249 U. S. 236; *Mo.* v. *Kansas Co.,* 265 U. S. 298; *People's Gas Co.* v. *Pub. Ser. Comm.,* 270 U. S. 550; *Pub. Util. Comm. of R. I.,* v. *Attleboro etc. Co.,* 273 U. S. 83.

The Florida ports are, in good faith and for business purposes, points of distribution for the Company's products. The movement out, therefore, is a separate and distinct distributing movement and not a continuation of

the original movement. *Gulf, Colo. & S. F. Ry.* v. *Texas,* 204 U. S. 403; *Chicago, M. & St. P. Ry.* v. *Iowa,* 233 U. S. 334; *Arkadelphia Co.* v. *St. Louis etc. Ry.,* 249 U. S. 134.

Distinguished: *Texas & N. O. R. R.* v. *Sabine Co.,* 227 U. S. 111; *B. & O. R. R.* v. *Settle,* 266 U. S. 166; *Stafford* v. *Wallace,* 258 U. S. 495; *Binderup* v. *Pathe,* 263 U. S. 291; *Lemke, Atty. Gen.* v. *Farmers Co.,* 258 U. S. 50.

The traffic in fuel oil is also intrastate traffic. *Washington etc. Co.* v. *G. N. Ry.,* 102 I. C. C. 363;

Distinguished: *Internat'l Corp.* v. *Director Gen'l,* 60 I. C. C. 726; *Alexander Grocery Co.* v. *Beaumont, S. L. & W. Ry.,* 104 I. C. C. 155; *Tampa Fuel Co.* v. *A. C. L.,* 43 I. C. C. 231.

*Mr. Fred H. Davis,* Attorney General of Florida, and *Messrs. Theodore T. Turnbull* and *George C. Bedell,* filed a brief as *amici curiae* for the State of Florida and its Railroad Commission, by special leave of Court.

MR. CHIEF JUSTICE TAFT delivered the opinion of the Court.

This case comes here for review on petitions for certiorari to the United States Circuit Court of Appeals for the Sixth Circuit by both parties, allowed March 21, 1927 (273 U. S. 691). The District Court's opinion is reported in 13 F. (2d) 633; that of the Circuit Court of Appeals in 16 F. (2d) 441.

The case was begun by a bill in equity filed by the Standard Oil Company, a corporation of Kentucky, in the District Court for the Western District of Kentucky, against the Atlantic Coast Line Railroad Company, a corporation of Virginia, to secure an injunction forbidding the defendant from charging the complainant for the transportation of gasoline, refined oil, lubricating oil, and fuel oil, from the cities of Port Tampa, Tampa and Jacksonville, all in Florida, to other points in the same state,

at rates of freight other than the lawfully established intrastate rates for such commodities.

The bill avers that since June 15, 1923, the defendant railroad company has refused to accept shipments of the complainant from Port Tampa, Tampa and Jacksonville, Florida, to other points within the state at intrastate rates, and has compelled the complainant to pay thereon higher interstate rates, which it has done under protest; that according to the records of the complainant it has already overpaid to the defendant, between June 15, 1923, and April 17, 1925, the sum of $63,000. The prayer is for a temporary injunction and that, if the merits of the case are adjudged in favor of the complainant, a permanent injunction be granted and the case be referred to a special master to determine the overcharges, and that a judgment be entered therefor with interest at 6 per cent. from the date the same were accepted by the defendant until paid.

The answer denies that the charges collected were for other than interstate business. A motion to dismiss was made, on the ground that the complainant had an adequate remedy, either at the common law, or under a special remedy provided by the Florida statute. This motion to dismiss was overruled by the District Court, *Standard Oil Company* v. *Atlantic Coast Line Railroad Co.,* 13 F. (2d) 633; and while on appeal error was assigned for this, it does not appear to have been considered by the Circuit Court of Appeals, 16 F. (2d) 441, and is not assigned for error here. The jurisdiction rests on diverse citizenship of the parties and the only question before us is upon the merits.

The plaintiff maintains at Port Tampa, Tampa and Jacksonville large storage facilities, consisting of tanks and warehouses for receiving and storing gasoline, refined oil, lubricating oil and fuel oil. It does not produce or refine any of these products. Gasoline, refined oil and

lubricating oil it buys from the Standard Oil Company of Louisiana from its refineries at Baton Rouge, Louisiana, while the fuel oil it buys from the Standard Oil Company of New Jersey from Tampico, Mexico. These four varieties of oil products are brought into Port Tampa and Jacksonville in tank steamers owned and chartered by the sellers, and, with the exception of lubricating oil, the oil is pumped by ships' pumps from the steamers through pipe lines owned by the plaintiff into plaintiff's storage tanks at Port Tampa and at St. Johns River Terminal, Jacksonville, Florida. Lubricating oil is pumped from the tank steamers by ships' pumps into tank cars at Port Tampa, or at Jacksonville, and by them conveyed respectively over defendant's lines to plaintiff's storage tanks at Tampa, a distance of about nine miles from Port Tampa, or to Kings Road, a distance of about two miles from St. Johns River Terminal, near Jacksonville. All the products are purchased by the plaintiff to be delivered to it by the sellers at Port Tampa and Jacksonville, title not passing to the plaintiff until the products have been so delivered, settlement between the seller and purchaser being made upon the basis of the amount actually delivered into tank cars and tanks. The prices to be paid for gasoline, refined oil and lubricating oil are the current market prices in effect at the time the products are delivered to plaintiff at Port Tampa and Jacksonville. Fuel oil is purchased on yearly contracts at stipulated prices. The tank cars used by the plaintiff in its business are not owned by the railroad company, but are leased by the plaintiff and hauled by the defendant over its lines in common carrier service.

At Port Tampa, plaintiff maintains for the storage of gasoline five tanks, with an aggregate capacity of 110,000 barrels; for refined oil, storage tanks with a total capacity of 20,000 barrels; and for fuel oil, tanks with a total capacity of 127,000 barrels. At Jacksonville, it maintains

for the storage of gasoline, tanks with a total capacity of 162,000 barrels; for refined oil, storage tanks with a capacity of 40,000 barrels, and for fuel oil, storage tanks with a total capacity of 145,000 barrels.

Throughout Florida the plaintiff maintains 123 bulk stations where it has sufficient tankage and storage facilities for gasoline, refined oil and lubricating oil to meet the current needs of its customers supplied from such stations. These stations ordinarily get their supply of gasoline and refined oil from the storage tanks maintained at Port Tampa and Jacksonville, by means of tank cars. Very little, if any, gasoline or refined oil is delivered to consumers directly from the storage tanks at Port Tampa and Jacksonville. The gasoline and refined oils are delivered from the bulk stations to plaintiff's consumers by means of tank wagons. Plaintiff also maintains a large number of service stations in the State of Florida, which, in the usual course of business, are supplied with gasoline and refined oil directly from the bulk stations, although occasionally a service station is supplied with gasoline supplied in tank cars directly from Port Tampa and Jacksonville.

Under ordinary business conditions plaintiff keeps in its storage tanks at Port Tampa and at Jacksonville a sufficient supply of gasoline and refined oil to take care of its requirements for from forty-five to sixty days; a sufficient supply of fuel oil for from thirty to sixty days; and in its storage tanks at Tampa and at Kings Road a sufficient supply of lubricating oil for from sixty to ninety days, the exact time depending entirely upon business conditions and demands for the products in that section of the state. The plaintiff pays local taxes to the State of Florida on all of its products in hand in its storage tanks on the Florida assessing dates.

After the lubricating oil is placed in the storage tanks at Tampa and at Kings Road, it is distributed and sold in tank wagons, barrels and smaller containers, although a

small percentage of it is sent out in tank wagon cars to plaintiff's bulk stations and possibly to some small consumers.

The fuel oil is furnished by the Standard Oil Company of New Jersey to the plaintiff under a yearly contract for a million barrels to be delivered monthly in tank steamers at Port Tampa and Jacksonville as needed. Approximately ninety-five per cent. of the fuel oil sold by plaintiff in Florida is on contracts made before the oil has been shipped from the point of origin to plaintiff at Port Tampa and Jacksonville. Most of these are for a period of a year, covering the requirements of the various consumers, with average monthly deliveries stipulated, although, in actual practice, shipments from the storage tanks to the consumers are accommodated to their needs as under requirement contracts. There is no separation of the fuel oil under contract from that not under contract, all being of the same grade. At the time the shipment of the fuel oil is made from the point of origin, plaintiff can not say where any particular cargo of it, or any part thereof, will go after it has been pumped into the storage tanks, to whom it will go, or when it will be shipped. At the time of shipment from the point of origin, the only destinations which can be given are Port Tampa and Jacksonville, respectively.

The railway company has nothing to do with the boat movement of the products used by the plaintiff in its Florida business. There is no through rate and no joint arrangement of any character between the water carrier and the defendant. Movement by boat, while interstate commerce, is not actually under regulation by the Interstate Commerce Commission. From two to four boats per month, with an average capacity of 45,000 barrels each, discharge their cargoes in plaintiff's storage facilities at Port Tampa and Jacksonville. A boat requires from one to three days to discharge its cargo, and while boats are

engaged in discharging their cargoes into the storage tanks of plaintiff, tank cars are being loaded from the same storage tanks, for the purpose of supplying plaintiff's bulk stations, service stations and possibly a small amount directly to some consumers.·

Plaintiff has been conducting its business in the manner here stated for many years, and it was not adopted for the purpose of evading the payment of interstate rates. Its business could not be conducted without the storage facilities herein described, and until June 15, 1923, all shipments by the plaintiff from Port Tampa, Tampa and Jacksonville over defendant's lines to other points in Florida over purely intrastate routes, were accepted by the defendant as intrastate commerce. Since June 15, 1923, however, the defendant has classified these shipments as interstate commerce, and collected freight on the basis of interstate rates. Generally, in respect to this transportation, the intrastate rates approved by the Florida State Commission are lower than the interstate rates under the classification of the Interstate Commerce Commission, and it is the difference in favor of the plaintiff in the intrastate rates which has led to this litigation.

The District Court held that all the transportation of oil by the defendant for the plaintiff, after the oil reaches the storage tanks or tank cars, in Tampa, Port Tampa or Jacksonville, is intrastate commerce, and that the plaintiff is entitled to secure the transportation necessary in that commerce at intrastate rates. 13 F. (2d) 633. The Circuit Court of Appeals modified the order of the District Court, 16 F. (2d) 441, and held that the fuel oil landed at Port Tampa is a continuous foreign and interstate shipment from Tampico to its ultimate destination in Florida where it is used; that the gasoline and kerosene shipments through to Port Tampa must also be classified as interstate shipments from Baton Rouge to the bulk stations where they are distributed; that the lubricating oils

received at Port Tampa must be treated as distributed from the Tampa and Jacksonville storage tanks, and that from those places its transportation is to be regarded as intrastate; that as to gasoline and kerosene in Jacksonville, as 13 per cent. of it received into the tanks is used locally at Jacksonville, it must all be regarded as intrastate; that as to Jacksonville fuel oil the record is obscure and the case must be sent back to the trial court for further evidence.

These two writs of certiorari are secured, the one by the plaintiff oil company to reverse the decision of the Circuit Court of Appeals in so far as it reversed the District Court, and the other by the defendant railway company to reverse that decision in so far as it affirmed the District Court.

It seems very clear to us on a broad view of the facts that the interstate or foreign commerce in all this oil ends upon its delivery to the plaintiff into the storage tanks or the storage tank cars at the seaboard, and that from there its distribution to storage tanks, tank cars, bulk stations and drive-in stations, or directly by tank wagons to customers, is all intrastate commerce. This distribution is the whole business of the plaintiff in Florida. There is no destination intended and arranged for with the ship carriers in Florida at any point beyond the deliveries from the vessels to the storage tanks or tank cars of the plaintiff. There is no designation of any particular oil for any particular place within Florida beyond the storage receptacles or storage tank cars into which the oil is first delivered by the ships. The title to the oil in bulk passes to the plaintiff as it is thus delivered. When the oil reaches these storage places along the Florida seaboard, it is within the control and ownership of the plaintiff for use for its particular purposes in Florida. The plaintiff is free to distribute the oil according to the demands of its business, and it arranges its storage capacity to meet the

future variation in its business needs at Tampa, Port Tampa, or Jacksonville or St. Johns River Terminal.

The question whether commerce is interstate or intrastate must be determined by the essential character of the commerce, and not by mere billing or forms of contract, although that may be one of a group of circumstances tending to show such character. The reshipment of an interstate or foreign shipment does not necessarily establish a continuity of movement or prevent the shipment to a point within the same state from having an independent or intrastate character, even though it be in the same cars. *Chicago, M. & St. P. Ry. Co. v. Iowa,* 233 U. S. 334. The change from rail to ship has often been held consistent with a continuity of interstate or foreign commerce, even though there may be only local billing. *Texas & New Orleans R. R. Co. v. Sabine Tram Co.,* 227 U. S. 111; *Railroad Commission of Louisiana v. Texas & Pacific Ry. Co.,* 229 U. S. 336; *Baer Bros. Mercantile Co. v. Denver & Rio Grande Railroad Co.,* 233 U. S. 479. On the other hand, in *Chicago, M. & St. P. Ry. Co. v. Iowa, supra,* the reshipment of an interstate shipment of coal after its arrival in the state in the same carload lots was held not inconsistent with the change from interstate to intrastate commerce. In *Baltimore & Ohio S. W. R. R. Co. v. Settle,* 260 U. S. 166, 170, a shipper billed his goods from one state to another, paying the interstate freight and reshipped them to another point in the second state, intending from the first to reach the latter destination, but interrupting the transportation only to take advantage of a difference in his favor between the through rate and the sum of those paid. It was held that the essential nature of the entire movement was in interstate commerce and that the shipper must pay the only lawful rate, which was the interstate commerce rate to the final destination. These cases are illustrations to show that the determination of the char-

acter of the commerce is a matter of weighing the whole group of facts in respect to it.

The important controlling fact in the present controversy, and what characterizes the nature of the commerce involved, is that the plaintiff's whole plan is to arrange deliveries of all of its oil purchases on the seaboard of Florida so that they may all be there stored for convenient distribution in the state to the 123 bulk stations and to fuel oil plants in varying quantities according to the demand of the plaintiff's customers, and thence be distributed to subordinate centers and delivery stations, and this plan is being carried out daily. There is neither necessity nor purpose to send the oil through these seaboard storage stations to interior points by immediate continuity of transportation. The seaboard storage stations are the natural places for a change from interstate and foreign transportation to that which is intrastate, and there is nothing in the history of the whole transaction which makes them otherwise, either in intent or in fact. There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages of the plaintiff company at Tampa, Port Tampa, Jacksonville or the St. Johns River Terminal. Everything that is done after the oil is deposited in the storage tanks at the Tampa destinations, or at the Jacksonville destinations, is done in the distribution of the oil to serve the purposes of the plaintiff company that imported it. Neither the sellers who deliver the oil, nor the railroad company that aids the delivery of the oil to the storage tanks and tank cars at the seaboard, has anything to do with determining what the ultimate destination of the oil is, or has any interest in it, or has any duty to discharge in respect to it, except that the railroad company, after the storage in Florida has been established for the purposes of the plaintiff company, accepts the duty

of transporting it in Florida to the places designated by the plaintiff company.

The compensation for the transportation of the oil through the pipe lines from the steamers to the storage tanks or to the storage tank cars, and the transportation of those cars to the seaboard storage tanks of the plaintiff, is not here in question, and we are not asked to determine whether such deliveries to the storage tanks and cars on the seaboard from the steamers are interstate or foreign commerce.

We have no hesitation in saying that the nature of the commerce in controversy in this case was intrastate.

The case is like that of *General Oil Company* v. *Crain,* 209 U. S. 211, in which the General Oil Company sought an injunction against the collection of a tax for the inspection of certain of its oils in Tennessee, which it had brought into Tennessee and stored in tanks, and marked in storage tanks as oil already sold in Arkansas, Louisiana and Mississippi, and which remained in Tennessee only long enough to be properly distributed according to the orders therefor, and other oil in other tanks marked to be sold in those states but for which no orders at the time of shipment from the manufacturing plants had been received. This Court held that the Tennessee tax was not a burden on interstate commerce as applied to oil coming from certain states though ultimately intended for sale and distribution in states other than Tennessee; that the oil was subject to a tax while it was being stored in Tennessee for convenience of distribution and for reshipping in tank cars and barrels; that this was business done in Tennessee, where the oil was brought to rest, and was for a purpose outside its mere transportation.

It is not a question of maintaining the identity of oil as if a fungible in storage tanks through which it passed. The facts indicate that the plaintiff itself makes no such distinction and certainly agrees with no one to make such

a distinction.   The fuel oil is not different from the other kinds.   While the fuel oil is purchased by the plaintiff from a selling company, which has a year's contract, the seller delivers it from Tampico, at the Florida seaboard, as it is likely to be needed to meet the obligations of a number of yearly contracts made by the plaintiff for its delivery in certain parts of Florida.   No oil which comes in is labeled or identified in any particular way with any particular company, except after it is shipped to that company from Tampa or from Jacksonville.   There is no passage of title from plaintiff to the contract purchasers, and there is no setting apart of particular oil, until the shipments are made at the end of this interval of weeks and months in accordance with the needs of those who have contracted to buy it.

The argument is made that these are continuous streams of oil from Baton Rouge or Tampico into bulk stations in the interior of Florida where it is sold to the customers of the plaintiff, and that its interstate character continues through that entire passage.   It may be, as suggested in the argument, that oil is being discharged into plaintiff's receptacles for its storage at the same time that it is being discharged from the storage tanks into storage tank cars for its distribution, but that is not at all inconsistent with its being a closing of an interstate or foreign transportation and a beginning of intrastate distribution for the purposes and business of the plaintiff.

We think the view of the Supreme Court of Florida in a mandamus case in respect to these very rates is the correct one.   *State* v. *Seaboard Air Line Ry. Co.; Same* v. *Atlantic Coast Line Railroad Co.*, 109 Sou. 656.   We concur in the reasoning and conclusions of the United States Circuit Court of Appeals for the Fourth Circuit in *Atlantic Coast Line Railroad Co.* v. *Standard Oil Co. of New Jersey; Seaboard Air Line Ry. Co.* v. *Same*, 12 F. (2d) 541.

Reliance is put on *Stafford* v. *Wallace*, 258 U. S. 495, to sustain the claim that this transportation of plaintiff's oil in Florida is interstate commerce. In that case the question under consideration was the validity of the Packers and Stockyards Act of Congress of 1921, c. 64, 42 Stat. 159, providing for the supervision by Federal authority of the business of the commission men and of the live stock dealers in the great stock yards of the country, and it was held that for the purpose of protecting interstate commerce from the power of the packers to fix arbitrary prices for live stock and meat through their monopoly of its purchase, preparation in meat, and sales, Congress had power to regulate the business done in the stockyards, although there was a good deal of it which was strictly speaking, only intrastate commerce. It was held that a reasonable fear upon the part of Congress, that acts usually affecting only intrastate commerce when occurring alone, would probably and more or less constantly be performed in aid of conspiracies against interstate commerce, or constitute a direct and undue obstruction and restraint of it, would serve to bring such acts within lawful Federal statutory restraint.

The Court relied much on the case of *United States* v. *Ferger*, 250 U. S. 199, where the validity of an act of Congress, punishing forgery and utterance of bills of lading for fictitious shipments in interstate commerce, was in question. It was there contended that there was and could be no commerce on a fraudulent and fictitious bill of lading, and therefore that the power of Congress could not embrace such pretended bill. In upholding the act, this Court, speaking through Chief Justice White, answered the objection by saying:

"But this mistakenly assumes that the power of Congress is to be necessarily tested by the intrinsic existence of commerce in the particular subject dealt with, instead of by the relation of that subject to commerce and its

effect upon it. We say mistakenly assumes, because we think it clear that if the proposition were sustained it would destroy the power of Congress to regulate, as obviously that power, if it is to exist, must include the authority to deal with obstructions to interstate commerce (*In re Debs*, 158 U. S. 564) and with a host of other acts which, because of their relation to and influence upon interstate commerce, come within the power of Congress to regulate, although they are not interstate commerce in and of themselves."

The use of this authority as a basis for the conclusion in *Stafford* v. *Wallace* clearly shows that the case can not be cited to show what is interstate and what is intrastate commerce in a controversy over rates to determine whether they come normally within the regulation of Federal or State authority.

Our conclusion is that, in all the cases presented by the plaintiff in its bill, intrastate rates should have been applied and should be applied in the future, so long as the facts remain as they are now. This leads to a reversal of the decision of the Sixth Circuit Court of Appeals as to fuel oil from Port Tampa, as to gasoline and kerosene from Tampa, and an affirmation of its decision as to lubricating oil through Port Tampa; an affirmation of its decision as to gasoline from Jacksonville, as to kerosene from Jacksonville, and as to lubricating oil from Jacksonville. As to fuel oil from Jacksonville, the Circuit Court of Appeals left the matter undetermined. We think that fuel oil also from Jacksonville should be treated as subject to intrastate rates. The result is that the decision of the Circuit Court of Appeals is partly affirmed and partly reversed, that of the District Court is wholly affirmed, and the case is remanded to the District Court for further proceedings.

*Affirmed in part; reversed in part.*