CUMBERLAND COLD STORAGE CO.

RE: APPLICATION FOR CONTRACT CARRIER PERMIT

Kennebec.   Opinion, May 7, 1964.

*Harry H. Marcus,*
*Frank M. Libby,* for Plaintiff.

*Raymond E. Jensen,*
*Robert W. Donovan,* for Defendant.

SITTING: WILLIAMSON, C. J., WEBBER, TAPLEY, SULLIVAN, SIDDALL, MARDEN, JJ.

MARDEN, J. On appeal from a decree of the Public Utilities Commission granting a contract carrier permit to appellee.

Cumberland Cold Storage Co., hereinafter termed Cumberland applied to the Public Utilities Commission, hereinafter termed Commission for a permit as a contract carrier for the purpose of transporting "Frozen Food in refrigerated units for Super Markets and Frozen Food Processors and Brokers including, but not limited to, A & P Tea Co., Shaw's, I.G.A., Columbia Markets, from Cumberland Cold Storage Co. in Portland to Super Markets in the State of Maine." To this application several holders of certificates for common carriage intervened. Upon hearing, the Commission granted a permit authorizing the transportation of "Frozen foods in refrigerated units from Cumberland Cold Storage Co. at Portland to retail stores in the State of Maine." From this grant the intervenors appeal upon the following points:

"1. The Order, Judgment and Decree of the Commission is unwarranted in law because it is not supported by any substantial evidence and is predicated on erroneous applications of law.

"2. If there was any substantial evidence presented, the Order, Judgment and Decree of the Commission is unwarranted in law because it is broader in scope than the evidence justifies.

"3. If there was any substantial evidence presented, the Order, Judgment and Decree of the Commission is unwarranted in law because it fails to distinguish properly between common carrier and contract carrier rights and in effect grants a common carrier certificate under the guise of a contract carrier permit.

"4. The Commission over Intervenors' objections erroneously permitted supporting witnesses to give evidence of interstate shipments, and erroneously relied on such evidence in making its findings and its Order, Judgment and Decree."

The legislative policy affecting the operation of motor trucks for hire is to be found in Chapter 48, § 19, R. S. The definition of contract carrier and the criteria governing consideration of an application for a permit for contract carriage is to be found in Section 23 of the same Chapter, as revised.

Extracted from subparagraph III of Section 23, it is declared that no permit for contract carriage shall be granted:

(1) if the commission shall be of the opinion that the proposed operation of any such contract carrier will be contrary to the declaration of policy of sections 19 to 33, or otherwise will not be consistent with the public interest, or

(2) if the granting will impair the efficient public service of any authorized common carrier or common carriers then adequately serving the same territory by rail or over the same general highway route or routes or

(3) if an increase in the number of contract carriers operating in the area to be served by the applicant will interfere with the use of the highways by the public. * * *

(4) Permits granted by the commission shall authorize only such operations covered by the application as the commission finds to be justified by the evidence, and

(5) no permit shall be granted unless it appears that the applicant is fit, willing and able properly to perform the service of a contract carrier by motor vehicle and to conform to the provisions of sections 19 to 33, inclusive, and to the rules and regulations of the commission issued thereunder.

The basis of Cumberland's application is that present service available from common carriers for the transportation of frozen foods is inadequate, both as to schedule of possible deliveries and the necessary temperature control. The need which Cumberland alleges is refrigerated transportation to move the orders released by its storers to retail markets upon demand, unrestricted by regular schedules or regular routes, under efficient temperature control, within the tolerances accepted by the industry and expressed in tables prepared by U. S. Department of Agriculture.*

The thrust of the appeal is aimed at what intervenors contend is a finding by the Commission of need unsupported by any substantial evidence (Point 1) and that if it be found that substantial evidence was offered of need, the permit proposed by the Commission is broader than is "justified by the evidence" (Point 2). Additionally, appellant urges the permit here granted fails to distinguish properly between common and contract carrier rights (Point 3) and that evidence dealing with interstate shipments was erroneously applied by the Commission (Point 4).

Factually a finding is justified that Cumberland operates a cold storage facility of very substantial capacity (fifty million pounds) into which is shipped both from within and without the State varieties of frozen foods which are held to producer-storer's order within a temperature range of zero to minus five degrees in accordance with accepted frozen food merchandising practices, and temperature tolerances advocated by the U. S. Department of Agriculture. From this bank of frozen foods, distributors and retail stores within the State draw their supplies in varying amounts by placing orders with the producers of the goods, which in turn authorize Cumberland to fill the orders. In

---

* Not in effect at the time of the hearing before the Commission but in effect since September 21, 1963 is § 228 B ["Storage and Transportation of Frozen Foods"] Chapter 32, R. S. reflecting legislative concern on temperature control. (Chap. 186, P. L., 1963.)

some instances, and particularly in the Portland area, the purchaser furnishes his own transportation and thereupon assumes risk of temperature control, — deterioration of the foods by the periods of non-refrigerated transportation to which the food is exposed. In about 80% of the shipments out of Cumberland, Cumberland is requested to choose the carrier for movement of the goods and in these instances, and inherent in the responsibility of a frozen food purveyor, Cumberland seeks to procure transportation which will in transit hold the temperature of the shipment to no higher than zero degrees. Any exposure of the frozen products to higher temperature initiates deterioration in its quality.

The intervenors, with one exception, Congdon, operate, as common carriers, refrigerated transportation, the types being trailers with built-in refrigeration units, or in some instances smaller so-called straight units, — trucks with refrigerating equipment. These common carriers by definition and in practice operate on schedules over regular routes, and the problems of Cumberland in delivering by common carrier, and in trying to comply with customers' orders, are a repetition of those discussed in *Bangor & Aroostook Railroad Co. Re: Application To Amend P. U. C. Certificate J #44* as reported in 159 Me. 86, 188 A. (2nd) 485.

From the record Cumberland has never had more than one-half trailer load (7½ - 8 tons) going out of Portland and the efficiency of temperature control is proportional to the extent to which the load fills the trailer. The smaller the portion of the trailer load occupied by the frozen product, the less efficiently can the temperature be held at not above zero, and a jury hearing the evidence could find that it is impossible to hold frozen goods at zero or below in small fractions of a trailer load. As the volume of each frozen food shipment offered decreases, the problem of the common carrier is increased in service supplied and tem-

perature control. In less than trailer load shipments, — and when the common carrier can plan in advance, the frozen foods are stored in the front end of the trailer adjacent to the refrigerating unit, insulation is then inserted and the remaining space is filled with dry freight, the presence of which accentuates the problem of temperature control. If a less than trailer load shipment of frozen food is offered after the loading of the trailer has begun, either a reloading is involved or the frozen foods are packed in insulated hampers and attempt is made to hold the temperature by the use of dry ice. Of the five intervenors upon behalf of which evidence was offered (Cole's, Fox & Ginn, Sanborn's, Maine-Border and Congdon) three operated trailers, evidence as to a fourth is unclear, and a fifth admittedly operated no refrigerated transportation. From the record, only two intervenors had any "straight" refrigerated transportation (Sanborn's and Cole's) and the smaller straight units, or in the case of Cole's Express, three units of "pick-up" size, were stationed and used in areas or for purposes not consistent with Cumberland's needs. Cole's Express had "pick-ups" stationed in Bangor, Houlton and Presque Isle for deliveries of frozen foods from its terminals in those locations to the addressees. Sanborn's Motor Express has four straight units, the location of only one of which is identified as being in Portland and used in that area to transport from its interstate terminal to Portland area addressees.

The volume of frozen food carriage from Cumberland in relation to total carriage was characterized as from one-tenth of one percent in the case of Cole's Express to approximately one percent in the case of Sanborn's Motor Express, less than one percent in the case of Fox & Ginn, and "a very small percentage" in the case of Congdon Transportation. The total frozen food transport from Cumberland during the first quarter of 1963 was 5 shipments totalling 3,375 pounds by Congdon Transportation and during the

first four months of 1963 was 12 shipments totalling 11,597 pounds by Cole's Express.

Our law, by which the validity of the Commission's decree is tested, has been stated a number of times, the most recent being *Bangor & Aroostook Railroad Co., supra,* at page 89, in which it was said that "if the factual finding upon which the Commission decree is based is supported by such evidence as taken alone would justify their conclusion, its finding is final."

The evidence, the substantiality of which is tested here and emphasized by the intervenors, is whether or not the applicant has shown a need for its proposed service and, paraphrasing, if there be evidence of need it was "for the Commission to determine in the exercise of a sound discretion whether or not the satisfaction of that need would be consistent with the public interest and the public policy announced by the Legislature." *Merrill* v. *Maine Public Utilities Commission,* 154 Me. 38, 43; 141 A (2nd) 434; *Richer, Re: Contract Carrier Permit,* 156 Me. 178, 185; 163 A. (2nd) 350. The record here confirms substantial evidence of need and the finding of the Commission on this point is warranted.

Substantial evidence supporting a finding of need having been confirmed, appellants now urge (Point 2) that the permit granted by the Commission violates criterion (4) ante because it is a broader grant than that either applied for or "justified by the evidence." At this point the application and the permit quoted earlier in the opinion must be compared. The portion of the permit which is criticized is that it grants broad authority to carry frozen foods not limited to the shippers supporting the petition and to the areas covered by the testimony. No suggestion has been made that a distinction should be made between "super markets" mentioned in the application and "retail stores" fixed in the permit. No case has been cited to us fixing legally a dis-

tinction and the only case we have found is *Rosen* v. *Pustilnik*, 204 N.Y.S. (2nd) 221, 223 (Supreme Court 1960) which is not on point and for the purposes of this case we draw no distinction. The decree complies with the mandate found in Section 23 III of Chapter 48, R. S., as amended.

Intervenors contend that the appearance of the Manufacturer's representative of three interstate processors of frozen foods, a local distributor, and the buyer for a chain store operating in Bangor must be considered as supporting only the grant of a permit for contract carriage for their needs. We must accept their testimony as supporting proof of a need by both applicant and retail outlets in the carriage of frozen foods within the State. The phrasing of the permit is not unwarranted and is justified by the evidence.

Intervenors' point three contends that the permit granted Cumberland in effect grants a common carrier certificate, and fails to distinguish properly between common carrier and contract carrier rights. The distinction between these types of license is made clear in *Public Utilities Commission* v. *Johnson Motor Transport*, 147 Me. 138, 145; 84 A. (2nd) 142. The findings which we have determined the evidence justifies, and which we have recited earlier in the opinion, make it clear that this distinction has been observed. Cumberland does not seek and has not been granted authority to carry all kinds of goods for anyone on schedule and over established routes. Cumberland has sought and has been granted authority to transport a particular class of merchandise, in special equipment, through private negotiations with those who seek the transportation, — subject, of course, to Commission supervision. The permit is not unwarranted for this reason.

Intervenors' point four reserved procedurally was neither briefed nor argued, but we have not been advised that it was waived. We find nothing to indicate that any collateral

reference to interstate shipments was considered or is reflected in the Commission's decree and as a matter of law, expressed in *Atlantic Coast Line Railroad Company* v. *Standard Oil Company of Kentucky*, 275 U. S. 257, 268 (1927), the character of the proposed shipments from Cumberland are properly characterized as intrastate.

Remaining statutory criteria and found by the Commission to be met are not criticized. However, the affirmed finding of "need" reflects "inadequacy" of common carriage under criterion (2) and, reiterating *Richer, supra,* at page 187, the possible loss of some traffic ("1%," "a very small percentage") cannot well be the basis for a finding of impairment of efficient public service. We find nothing in the record to weaken the Commission's finding that the proposed operation is consistent with the statutory policy expressed in criteria (1), (3) and (5).

*Appeal denied.*