**STATE of Missouri ex rel. William MACKLEY, Appellant,**

v.

**PUBLIC SERVICE COMMISSION of the State of Missouri et al., Respondents.**

No. KCD 30466.

Missouri Court of Appeals, Western District.

Dec. 3, 1979.

Donald J. Quinn, Kansas City, for appellant.

Arthur L. Conover, Deputy Gen. Counsel, Jefferson City, for respondents.

Before WASSERSTROM, C. J., Presiding, WELBORN, Special Judge, and HOUSER, Senior Judge.

WELBORN, Special Judge.

Proceeding for review of order of Missouri Public Service Commission ordering trucker to cease and desist from carriage of property for hire within the State of Missouri until he had obtained proper authority to do so. Circuit Court affirmed order of Commission.

The issue presented is whether or not the movements which precipitated the Commission's order are interstate or intrastate.

Aileèn Quirk & Sons, Inc., is a Missouri corporation engaged in the business of buying, warehousing and selling beans throughout the United States. Quirk owns two country elevators at which it purchases beans from growers. One is in Mitchell, Nebraska, the other at Lyman, Nebraska. Its sales office is in North Kansas City, Missouri. It has a warehouse there.

Generally, beans purchased at the country elevators are there cleaned and graded and packaged in 100-pound sacks. They are then transported by railroad to the North Kansas City warehouse. The transactions which gave rise to the Commission's investigation, hearing and order involved four

movements in 1974, of beans sold by Quirk to Banquet Foods and transported by William Mackley by truck from the North Kansas City warehouse to Banquet's food processing plant in Carrollton, Missouri, and four movements of beans sold by Quirk to Associated Grocers in St. Louis, likewise transported by truck from the North Kansas City warehouse to the St. Louis destination. Mackley had no permit issued by the Public Service Commission.

On February 26, 1974, a St. Louis food broker issued a Sales Memo for the sale of " *4 truckloads* 480 sax each 100 # U.S. # 1 Pinto Beans" to Banquet Foods Corporation at Carrollton, Missouri, for the account of Quirk. The sale was for deliveries through March, 1974. The price was $59.50 per cwt., with 1% cwt. carrying charge for deliveries after March, 1974.

The beans so ordered were delivered by Mackley by truck from the North Kansas City warehouse to Banquet in Carrollton. There were four shipments of 480 bags, each 100 pounds, on April 8, April 30, August 30 and September 16, 1974, by bill of lading from Quirk in North Kansas City to Banquet in Carrollton.

According to Paul Quirk, the beans involved had originally been shipped from the Nebraska elevator to Quirk by Union Pacific Railroad. Quirk identified two bills of lading, each for 1000 bags of beans, 100 pounds, dated January 25, 1974, as covering the beans eventually sold to Banquet.

There was no documentary evidence of the transactions involving Associated Grocers. There was evidence that in those sales, the 100-pound sacks had been broken at the North Kansas City warehouse and the beans repackaged in 5, 10 and 25-pound packages.

According to Paul Quirk, they keep the beans they buy at the rural elevators as long as possible. Their purpose is to move the beans through the warehouse quickly. "We want our movement to be in and out, in and out. We don't want them to stay there for a long period of time, * * *. So, we keep as few beans there as we can, but we're always bringing them in, and they're always going out." " * * * 90 to 95 percent of the beans that are brought in are pretty well spoken for, not necessarily by a sale, but in our mind and in our past experience, it will tell us that so and so should be ready for some beans." Generally beans arriving at the warehouse receive a lot number which they retain until shipment so the identity of the beans is preserved in the warehouse.

Banquet usually placed orders for several truckloads at one time, but because of limited storage space at the Carrollton plant, they could handle only one truckload at a time, so Quirk would hold the beans and deliver them as requested, charging Banquet a warehousing fee.

Following a hearing, the Commission issued its report and order in which it concluded that " * * * there is a sufficient break in the transit of Quirk's product to terminate the interstate nature of the shipments, that the beans are not in transit while in the Kansas City warehouse, and that the subsequent shipments within the State of Missouri are intrastate in nature." The Commission ordered Mackley to cease and desist from the carriage of property for hire between points within the State of Missouri until such time as he shall obtain proper authority to do so. The circuit court affirmed the order. This appeal followed.

The decisive issue on the appeal is whether or not the transportation by Mackley of products from Quirk's warehouse in North Kansas City to purchasers of beans in Missouri was a movement in interstate commerce. If so, respondents acknowledge that he need only obtain an interstate permit under Section 390.071. Otherwise, the Commission asserts that he must obtain a permit or certificate of authority under either Section 390.051 or Section 390.061, RSMo 1978.

Appellant's major reliance on this appeal is upon the case of *Kansas State Corp. Comm., et al. v. Bartlett & Co. Grain*, 338 F.2d 495 (10th Cir. 1964); cert. denied 380 U.S. 964, 85 S.Ct. 1109, 14 L.Ed.2d 154 (1965). Bartlett involved efforts by the Kansas Corporation Commission to subject to its authority the transportation by truck of grain purchased by Bartlett from coun-

try elevators or other points in Kansas to River Rail Terminal Elevator operated by Bartlett, also located in Kansas.

"When the grain is delivered from the trucks at River Rail it is graded, tested, and deposited in a separate group of 'truck' bins, used only for such purpose. This trucked grain is held exclusively for resale to customers located outside Kansas. Later, after it is deposited in the bins, the grain is mixed and blended in order to maintain and improve its quality and to provide accurately classified grain to meet the specifications of appellee's customers. During the harvest season truck shipments increase, but they take place during the entire year. The outbound shipments from River Rail proceed regularly throughout the year. While the appellee may have outstanding contracts for grain of certain grade and quality, no truckload or shipment is obtained to fill any particular outstanding contract." *Bartlett,* 338 F.2d at 497.

In holding the movement to the terminal elevator to be part of an interstate activity, the court stated:

" * * * It is well established that goods ultimately destined for shipment to another state acquire the character of interstate commerce as soon as they begin their journey, even though there is a temporary break in transit in the state of origin. However, this halt is an incident of the interstate movement. *Texas & N. O. R. R. Co. v. Sabine Tram Co.,* 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442; *Chicago Board of Trade v. Olsen,* 262 U.S. 1, 43 S.Ct. 470, 67 L.Ed. 839. The principle applicable in determining whether a shipment is one in interstate commerce was stated by this court in *Wycoff Co. v. Public Service Comm'n of Utah,* 195 F.2d 252 (10th Cir.): 'If there is a continuing intent that the goods shall be transported until they reach a designated place, the entire transportation is a continuing one, notwithstanding that there may be a temporary stoppage enroute for a particular purpose.'" *Bartlett,* 338 F.2d at 497.

The court concluded:

" * * * [I]n the present case there is a continuing intent that the grain remain in interstate commerce until it reaches its destination at some point outside of the state of Kansas, and thus the truck shipment with which we are here concerned is in interstate commerce." *Bartlett,* 338 F.2d at 498.

The Commission rejected appellant's argument, based upon Bartlett. Instead the Commission found the cases of *Atlantic Coast Line R. R. v. Standard Oil Company,* 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927), and *Susquehanna Coal Co. v. Mayor and Council of City of South Amboy,* 228 U.S. 665 (1913), more persuasive and concluded that, under those cases, there was a sufficient interruption in the transportation of the beans upon their arrival in the warehouse that further movement of them to Missouri destinations was an intrastate activity. The two cases relied upon by the Commission in its order are likewise the only two cases cited on this appeal by respondents.

Appellant argues that the "primary question" in this case is whether or not there was a sufficient break in the interstate transit of the beans while in the North Kansas City warehouse to make the movement intrastate rather than interstate in nature. Appellant argues that the testimony of the witness Quirk showed a "continuing intent" that the beans were to continue their interstate character until ultimately called for by the consignees. Appellant points to the witness's testimony that the beans involved in the Banquet transaction came into the warehouse "specifically for Banquet on Banquet's orders." However, the documentary evidence showed that the beans were shipped from Nebraska a month before the Banquet order was placed. In such circumstances, the Commission was not obliged to accept the witness's testimony that the beans moved to the warehouse in order to fill an order previously received. The witness's subsequent testimony that "90 to 95 percent of the beans that are brought in are pretty well spoken for, not necessarily by a sale, but in our mind and in our past experience, it will tell us that so and so should be ready for some beans" was likely more in line with the actual practice

than were his assertions which were belied by the documentary evidence. Obviously any wholesaler who operates a warehouse from which the products he handles are moved to purchasers expects and intends that the products received at the warehouse will eventually move on in the distribution process. However, such a generalized intent is not the type of intent that will fix the nature of the movement of the goods from the warehouse.

Here the Commission did find that some shipments are made to Quirk's warehouse after a sale by Quirk. However, it took note of the fact that a different method of transportation is utilized—rail from Nebraska to the warehouse and truck from the warehouse to the purchaser. It also took note of the fact of some processing at the warehouse—the repackaging of the beans in smaller packages in the case of the Associated Grocers transaction. The Commission also noted that some of the beans delivered to Banquet had remained in the warehouse for seven months.

In these circumstances, this court cannot say that the Commission's conclusion that the interstate movement had ceased and the beans had come to rest in Missouri is unreasonable or unlawful. § 386.430, RSMo 1978.

This court does not consider the *Bartlett* case, the sole authority cited by appellant in order to carry the burden of showing the decision appealed from to have been erroneous, here controlling or persuasive. That case involved the preliminary intrastate transportation of grain, all of which was destined for ultimate interstate disposition. The interruption of the actual movement at River Rail was but a temporary interruption of the continuous movement of the grain in interstate commerce. Here, the actual interstate movement of the beans had terminated. They were placed in the warehouse for distribution, some for purchasers in Missouri, some for purchasers elsewhere. There was a break in their movement. Although there may have been some general idea on the part of Quirk as to the ultimate destination of the beans, their course from the warehouse was not predetermined as was the case with the grain in *Bartlett*, all of which was disposed of out-side of Kansas. On the facts, *Bartlett* is distinguishable.

Appellant's second point on this appeal attacks the Commission's order as vague, unlawful, arbitrary, capricious, unjust, unreasonable, in excess of statutory mandates, an abuse of discretion and an unreasonable burden on interstate commerce. The substance of the argument is that compliance with Missouri regulation will result in higher freight rates than would apply under the ICC commodity exemption for trucking of beans. That is a policy, not a legal, argument. Policy arguments are properly addressed to policy making agencies.

Judgment affirmed.

All concur.