**MIDDLEWEST MOTOR FREIGHT BUREAU, National Motor Freight Traffic Association, Inc., New York Motor Carrier Conference, Central States Motor Freight Bureau, Inc., Eastern–Central Motor Carriers Association, Inc., Central & Southern Motor Freight Tariff Association, Inc., Middle Atlantic Conference, Niagara Frontier Tariff Bureau, Inc., Pacific Inland Tariff Bureau, New England Motor Rate Bureau, Inc., Southern Motor Carriers Rate Conference, Petitioners,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

**STEERE TANK LINES, INC., Petitioner,**

v.

**INTERSTATE COMMERCE COMMISSION and United States of America, Respondents.**

Nos. 87–2043, 87–2419.

United States Court of Appeals, Eighth Circuit.

Submitted Oct. 20, 1988.

Decided Feb. 3, 1989.

Rehearing and Rehearing En Banc Denied in No. 87–2043 April 10, 1989.

Patrick McEligot, Washington, D.C., David E. Woodside, Jefferson City, Mo., Alvin Meikeljohn, Jr., Denver, Colo., for petitioners.

Evelyn G. Kitay and Edward J. Kiley, Washington, D.C., for respondents.

Before LAY, Chief Judge, McMILLIAN and WOLLMAN, Circuit Judges.

LAY, Chief Judge.

In July, 1986, Matlack, Inc. (Matlack), a transportation company, filed for a declara-

tory order with the Interstate Commerce Commission (ICC) to determine whether Matlack's ICC certificate covered certain shipments of bulk chemicals distributed from the St. Louis facility of Chemtech Industries, Inc. (Chemtech). The chemicals were to be delivered within the State of Missouri as part of a continuous interstate transportation service. The ICC instituted a proceeding, published notice in the *Federal Register* and solicited comments. Twenty-eight parties filed comments.

In June, 1987, the ICC issued a decision finding the traffic to be part of continuous interstate transportation. *Matlack, Inc.,* No. MC–C–10999 (ICC June 1, 1987) [hereinafter *Matlack I*]. The ICC also denied requests for discovery, determining that the record contained all the facts necessary to reach an informed decision. Following the June decision, several petitions to reopen were filed. In December, 1987, the ICC denied the petitions and affirmed the June decision. *Matlack, Inc.,* No. MC–C–10999 (ICC Dec. 16, 1987) [hereinafter *Matlack II*]. Middlewest Motor Freight Bureau and others instituted a petition for review seeking reversal of the ICC's declaratory order.[1]

Matlack holds an ICC certificate to transport general commodities under contracts with manufacturers and distributors of chemicals and related products. Chemtech maintains facilities at Kansas City, St. Louis and Springfield, Missouri. Chemtech receives products from out-of-state origins and at its Missouri facilities converts large inbound quantities into smaller outbound quantities. Shipments are made to customers throughout Missouri. Chemtech's affidavit to the ICC indicated that seventy to eighty percent of the bulk product received is subject to supply contracts consummated in advance of the product shipment to Missouri facilities. The remainder is purchased to fill requirements of known customers based on past practice.

Missouri officials issued citations to Matlack claiming the movements were intrastate transportation requiring state approval.

Petitioners initially argue the ICC lacked jurisdiction to decide whether the transportation was interstate or intrastate. Second, they assert that even assuming jurisdiction, the decision was arbitrary, capricious, an abuse of discretion and unsupported by substantial evidence on the record as a whole. We find jurisdiction and we affirm the decision of the ICC.

Jurisdiction

The Supreme Court has held that the ICC has primary jurisdiction to interpret federal motor carrier licenses. *Service Storage & Transfer Co. v. Virginia,* 359 U.S. 171, 173, 79 S.Ct. 714, 715, 3 L.Ed.2d 717 (1959); *see also Andrew G. Nelson, Inc. v. United States,* 355 U.S. 554, 558 n. 4, 78 S.Ct. 496, 499 n. 4, 2 L.Ed.2d 484 (1958); *Gray Lines Tour v. ICC,* 824 F.2d 811, 815 (9th Cir.1987). In *Service Storage* the Court held that the interpretation of an interstate commerce certificate should first be litigated before the ICC under 49 U.S.C. § 304(c) (now recodified at 49 U.S.C. § 11701(b)). *Service Storage,* 359 U.S. at 173, 79 S.Ct. at 715. Section 11701(b) provides that any person "including a governmental authority" may file a complaint with the ICC alleging that a carrier operating under an ICC certificate is transporting in excess of its authority. *Id.* The Court held that "interpretations of federal certificates [which on their faces cover the operations] should be made in the first instance by the authority issuing the certificate and upon whom the Congress has placed the responsibility of action." *Id.* at 177, 79 S.Ct. at 718. The Court reasoned that by leaving the interpretation of ICC certificates to the ICC, conflicts between state and federal authorities can best be avoided.

---

1. Petitioners are organizations, commonly known as rate bureaus, composed of motor common carriers of property operating in interstate and foreign commerce pursuant to authority issued by the Interstate Commerce Commission (ICC), and in intrastate commerce pursuant to authority issued by the various states. The ICC granted petitions to intervene by the State of Texas and the Missouri Division of Transportation (MDOT), but denied Texas' motion to consolidate and dismiss.

*Id.* at 178, 79 S.Ct. at 718.[2]

■ Petitioners claim the ICC certificate does not cover Matlack's deliveries from Chemtech in St. Louis because the operation takes place wholly within Missouri and is thus intrastate. The question is whether the transportation from the distribution point in Missouri to customers in Missouri is part of a continuous interstate operation originating outside of Missouri and is thus covered by the ICC certificate, or whether the second leg of transportation is separate and wholly intrastate. We hold the issue is clearly within the ICC's jurisdiction in interpreting whether its certificate covers the transportation. *See Jones Motor Co. v. Pennsylvania Pub. Util. Comm'n,* 361 U.S. 11, 80 S.Ct. 60, 4 L.Ed.2d 50 (1959). *Merchants Fast Motor Lines, Inc. v. ICC,* 528 F.2d 1042, 1044–45 (5th Cir.1976) (a party claiming that a carrier is in violation of its ICC certificate has recourse to the ICC initially).[3]

Judicial Review

■ This court will set aside agency action only if it is arbitrary, capricious, an abuse of discretion or unsupported by substantial evidence on the record as a whole. 5 U.S.C. § 706(2)(A), (E). This is a narrow standard. *Bowman Transp., Inc. v. Arkansas-Best Freight Sys., Inc.,* 419 U.S. 281, 285–86, 95 S.Ct. 438, 441–42, 42 L.Ed.2d 447 (1974). It is axiomatic that this court is not to substitute its judgment for the agency's. *Humphrey v. United States,* 745 F.2d 1166, 1170 (8th Cir.1984).

In *Texas & N.O.R.R. v. Sabine Tram Co.,* 227 U.S. 111, 33 S.Ct. 229, 57 L.Ed. 442 (1913), the Supreme Court held that the determination of whether transportation between two points within a state is part of a larger interstate transportation service depends on the essential character of the shipment. *Sabine,* 227 U.S. at 122, 33 S.Ct. at 233. A crucial factor in determining the character of a particular shipment is the "original and persisting intention of the shippers." *Baltimore & O.S.W.R.R. v. Settle,* 260 U.S. 166, 174, 43 S.Ct. 28, 31, 67 L.Ed. 189 (1922); *see also Sabine,* 227 U.S. at 124, 33 S.Ct. at 233. The *Sabine* Court found that the time when a shipment of goods can be ascribed to interstate commerce is when shipment begins its transportation for destination in another state. *Sabine,* 227 U.S. at 123, 33 S.Ct. at 233.

The ICC determined in *Armstrong World Indus., Inc.,* 2 I.C.C.2d 63 (Apr. 3, 1986), that there is no formula to apply in determining intent. Instead, intent should be determined from the facts and circumstances which surround the transportation. *Id.* at 69.

In the *Matlack I* decision of June 1, 1987, the ICC found from the facts presented that:

> [I]t is evident from the facts presented that Chemtech intended for its shipments to be in interstate commerce. The involved shipments move from out-of-State points of origin to the St. Louis distribution terminal and from there to their ultimate destination, almost always within 30 days. Since the vast majority of shipments involve supply contracts and other sales arrangements entered into prior to shipment, Chemtech knows, in almost all cases, the final destination from the moment the shipment leaves its out-of-State origin. Moreover, no manufacturing or processing takes place at St. Louis. Rather, Chemtech maintains a storage facility there simply to enable it to convert large volume inbound move-

---

**2.** Section 5(d) of the Administrative Procedures Act (APA) places the power to grant declaratory relief in the sound discretion of the agency. 5 U.S.C. § 554(e) (1982). An agency may issue a declaratory order to terminate a controversy or to remove uncertainty. *Id.*

**3.** In *Texas v. United States,* 837 F.2d 184 (5th Cir.), *cert. denied sub nom. ICC v. Texas,* — U.S. —, 109 S.Ct. 65, 102 L.Ed.2d 42 (1988), the Fifth Circuit denied the ICC's motion for preliminary injunction to preclude a state court enforcement action regarding shipments that the ICC has determined to be interstate, rather than intrastate, in nature. The court left open the question of whether the ICC had jurisdiction to issue the declaratory ruling. This is the question now before us. A petition for review is currently pending before the Fifth Circuit to determine that question. Argument was heard on that issue September 9, 1988. No decision has yet been filed.

ments into the smaller outbound volumes its customers need.

*Matlack I,* No. MC–C–10999, slip op. at 4 (ICC June 1, 1987) (footnotes omitted).

From these facts, the ICC determined that the chemicals did not "come to rest" in St. Louis and did not interrupt the continuity of the original movement in interstate commerce. The ICC found the record demonstrated Chemtech's intent was to ship to customers. Therefore the ICC determined that any movements from St. Louis to points within Missouri were deemed interstate commerce.

Petitioners argue the facts of this case are analogous to *Atlantic Coast Line R.R. v. Standard Oil Co.,* 275 U.S. 257, 48 S.Ct. 107, 72 L.Ed. 270 (1927), and that *Atlantic* is controlling. The ICC distinguished this case because in *Atlantic* the Court found no intent at the time of initial movement that the product be shipped beyond the storage facilities.

> The controlling fact in *Atlantic* is that: [T]he plaintiff's whole plan is to arrange deliveries of all of its oil purchases on the seaboard of Florida so that they may all be there stored for convenient distribution in the state to the 123 bulk stations and to fuel oil plants in varying quantities according to the demand of the plaintiff's customers, and thence be distributed to subordinate centers and delivery stations, and this plan is being carried out daily * * *. There is nothing to indicate that the destination of the oil is arranged for or fixed in the minds of the sellers beyond the primary seaboard storages of the plaintiff company * * *.

*Atlantic,* 275 U.S. at 269, 48 S.Ct. at 110. In contrast, the ICC clearly found that Chemtech intends that its product continue movement through St. Louis for delivery to known customers. *Matlack I,* slip op. at 5.

Under the facts presented we cannot say that the ICC's finding that the essential character of the shipment is interstate commerce is arbitrary, capricious, an abuse of discretion or unsupported by substantial evidence on the record as a whole. The decision of the ICC is hereby affirmed.[4]

---

**4.** Subsequent to its decision in *Matlack I and II,* the ICC declined to issue a declaratory order to determine whether certain transportation was interstate or intrastate in nature. *Arvada Transfer Co., Inc.—Petition for Declaratory Order,* No. MC–C–30074 (ICC Mar. 8, 1988). That decision is consistent with *Matlack I and II;* in *Arvada* the state had not yet taken a position as to the nature of the transportation, so there was

not yet a controversy to be determined by the ICC. In addition, *Arvada* stated that the criteria and analysis set forth in *Matlack I and II* should provide guidance for the resolution of controversies over the characterization of transportation. We find that *Arvada* does not represent a change in ICC policy of providing the proper forum to interpret Federal Motor Carrier certificates.