# In the

# United States Court of Appeals

## For the Seventh Circuit

No. 09-1181

ANTHONY COLLINS, *et al.*,

*Plaintiffs-Appellants*,

*v.*

HERITAGE WINE CELLARS, LTD. and STEVEN HIRSCH,

*Defendants-Appellees.*

Appeal from the United States District Court
for the Northern District of Illinois, Eastern Division.
No. 07 C 1246—**Robert M. Dow, Jr.**, *Judge.*

ARGUED SEPTEMBER 24, 2009—DECIDED DECEMBER 21, 2009

Before POSNER, MANION, and TINDER, *Circuit Judges*.

POSNER, *Circuit Judge*. Collins and his fellow plaintiffs—truck drivers employed by Heritage Wine Cellars, a wholesale importer and distributor of wine—sued Heritage and its chief executive officer under the Fair Labor Standards Act, 29 U.S.C. §§ 201 *et seq.* The Act requires employers to pay overtime (one-and-a-half times the hourly wage) to employees who work more than 40 hours a week, 29 U.S.C. § 207(a)(1), which the plain-

tiffs sometimes did; yet until 2007 they were not paid overtime.

The plaintiffs transport wine from a warehouse in the Chicago area, owned by Heritage, to retail stores in Chicago and elsewhere in Illinois. To get the wine to the warehouse from the states and foreign countries in which it's produced (none of it is produced in Illinois), Heritage hires truck companies and other carriers. They are independent contractors. Neither they nor their employees are employed by Heritage, unlike the plaintiffs. But Heritage controls the wine and directs its movements on the entire journey from the state or country of origin of the wine to the retail stores in Illinois to which the plaintiffs transport the wine from the warehouse.

The principal question is whether the portion of the transportation that is entirely within Illinois is nevertheless interstate commerce within the meaning of the Motor Carrier Act, 49 U.S.C. §§ 502-07, 522-23, 525-26, 31502-04. The district court ruled that it was. The significance of the ruling is that the Fair Labor Standards Act exempts from its overtime provisions "any employee with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of section 31502 of title 49." 29 U.S.C. § 213(b)(1). The reference is to a section of the Motor Carrier Act that authorizes the Secretary to establish qualifications and maximum hours of service for employees of a motor carrier if "property . . . [is] transported by [the] motor carrier between a place in a State and a place in another State," 49 U.S.C.

§§ 13501(1)(A), 31502(b), provided that the employees "engage in activities of a character directly affecting the safety of operation of motor vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act." 29 C.F.R. §§ 782.2(a); *Levinson v. Spector Motor Service*, 330 U.S. 649, 670-72 (1947); *Walters v. American Coach Lines of Miami, Inc.*, 575 F.3d 1221, 1227-28 (11th Cir. 2009) (per curiam).

An employer subject to the Secretary's jurisdiction is required to register with the Department of Transportation. 49 C.F.R. § 385.301. Heritage, for reasons unexplained—for it claims to be subject to that jurisdiction, as otherwise it could not claim the exemption for truckers engaged in interstate commerce—has not registered. But it points out that the exemption depends on the Secretary's "*power* to establish qualifications and maximum hours of service" (emphasis added) and not on whether the power has been exercised. See *Bilyou v. Dutchess Beer Distributors, Inc.*, 300 F.3d 217, 229 (2d Cir. 2002), and cases cited there.

If Heritage bought wine from a vineyard in Indiana, made a contract to sell it to a retail store in Chicago, shipped the wine by rail to a freight yard in Chicago, and from there truck drivers employed by it just to transport wine from the freight yard to the store did so, it would be subject to the exemption even though the drivers had not crossed a state line themselves. E.g., *id.* at 224-25; *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469-70 (9th Cir. 1997); *Foxworthy v. Hiland Dairy Co.*, 997 F.2d 670

(10th Cir. 1993); *Galbreath v. Gulf Oil Corp.*, 413 F.2d 941 (5th Cir. 1969); see also *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 567-69 (1943). The entire shipment would be deemed a single interstate shipment. The fact that in the course of its journey the wine had been unloaded from one carrier and loaded onto another would be as inconsequential as the fact that en route to the store the truck had stopped for a red light.

But suppose instead that Heritage shipped its wine to a wholesale distributor in a Chicago suburb, title passed to the distributor when the wine arrived at the distributor's warehouse, and the distributor contracted to sell the wine to retail stores and delivered it to them in his own trucks. The carriage of the wine from the warehouse to the stores would be classified as an intrastate shipment under the Motor Carrier Act even though the property shipped had originated outside the state. See *McLeod v. Threlkeld*, 319 U.S. 491, 494 (1943); *Higgins v. Carr Bros. Co.*, 317 U.S. 572, 573-74 (1943); *Atlantic Coast Line R.R. v. Standard Oil Co.*, 275 U.S. 257, 262-63, 267-70 (1927); *Missouri ex rel. Barrett v. Kansas Natural Gas Co.*, 265 U.S. 298, 306, 308 (1924); *Chicago, Milwaukee & St. Paul Ry. v. Iowa*, 233 U.S. 334, 342-43 (1914); *Schultz v. National Electric Co.*, 414 F.2d 1225, 1226-28 (10th Cir. 1969).

Congress could still regulate such a shipment if it wanted to. Such intrastate shipments have a cumulatively substantial effect on interstate commerce. *North Alabama Express, Inc. v. ICC*, 971 F.2d 661, 666-67 (11th Cir. 1992); see also *Gonzales v. Raich*, 545 U.S. 1, 15-22 (2005); *United States v. Blum*, 534 F.3d 608, 610-12 (7th Cir.

2008). They substitute for uninterrupted interstate shipments to the destination of the intrastate shipments, and they use the same highways and other transportation facilities. But the language of the Motor Carrier Act—"transported . . . between a place in a State and a place in another State"—does not indicate a congressional intention of regulating a purely intrastate shipment merely because of its effect on interstate commerce. The shipment itself must be in some sense interstate commerce (transportation between a place in a state and a place in another state).

This case falls in between our two examples but closer to the first. About a fourth of the wine that Heritage ships to its warehouse in Illinois has been ordered in advance by the retail stores. That wine stays in the warehouse only briefly because Heritage has an order in hand. The fact that the wine pauses in its Heritage-controlled journey to the retail outlet is of no greater consequence than the unloading and reloading of the shipped goods in our first example. The other three-fourths of the wine sits in the warehouse until Heritage has found a buyer. But it appears that most of that wine turns over approximately every month, having been purchased and shipped by Heritage on the basis of its estimates of customer demand. And none of the wine undergoes any alteration on its trip from the vineyard to a retail store in Illinois. So far as appears, there is no processing (or even any deliberate aging of the wine in the warehouse), no addition of additives, no incorporation into another product, not even relabeling as a private-label (house-brand) product. When the wine arrives at the warehouse,

it is taken off the shrink-wrapped pallets on which it is delivered and shelved in the warehouse, period.

It seems to us that when a shipper transports his product across state lines for sale by him to customers in the destination state, and the product undergoes no alteration during its journey to the shipper's customer, and interruptions in the journey that occur in the destination state are no more than the normal stops or stages that are common in interstate sales, such as temporary warehousing, the entire journey should be regarded as having taken place in interstate commerce within the meaning of the Motor Carrier Act's exemption from the Fair Labor Standards Act. We'll defend this conclusion, but we first note that although it is consistent with the results in most cases, see *Merchants Fast Motor Lines, Inc. v. ICC*, 5 F.3d 911, 916-19 (5th Cir. 1993); *Central Freight Lines v. ICC*, 899 F.2d 413, 420-23 (5th Cir. 1990); *Roberts v. Levine*, 921 F.2d 804, 810-14 (8th Cir. 1990); *Walling v. American Stores Co.*, 133 F.2d 840, 845-46 (3d Cir. 1943); but see *Baird v. Wagoner Transportation Co.*, 425 F.2d 407, 410-12 (6th Cir. 1970), many courts, influenced by a regulation promulgated by the Department of Labor and policy statements and decisions of the Department of Transportation (and its predecessor as enforcer of the Motor Carrier Act, the now-defunct Interstate Commerce Commission), would reach the result by a more complicated analysis than we.

The regulation, which codifies a ruling that the Interstate Commerce Commission had made in 1957, states that intrastate transportation from a storage terminal is not

interstate commerce "if the shipper has no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment," 29 C.F.R. § 782.7(b)(2) (1971), and that there is no "fixed and persisting intent" if "(i) at the time of shipment there is no specific order being filled for a specific quantity of a given product to be moved through to a specific destination beyond the terminal storage, and (ii) the terminal storage is a distribution point or local marketing facility from which specific amounts of the product are sold or allocated, and (iii) transportation in the furtherance of this distribution within the single State is specifically arranged only after sale or allocation from storage." The applicability of clauses (i) and (iii) to this case is unclear. Some intrastate shipments were arranged after a sale was made, while others occurred pursuant to orders received by Heritage before the wine had been shipped from its place of origin far from Illinois. But it would be odd to conclude that Heritage had "no fixed and persisting transportation intent beyond the terminal storage point at the time of shipment" even with respect to those wines for which it had no order in hand. It intended that they would remain in its warehouse only as long as it took to find a customer, and it compressed the time to find one by basing deliveries to the warehouse on projections of demand calculated from customers' purchase histories.

The Interstate Commerce Commission had offered an alternative elaboration of "fixed and persisting intent" in a 1992 policy statement, ICC Policy Statement, *Motor Carrier Interstate Transportation—From Out-of-State Through*

*Warehouses to Points in Same State*, 57 Fed. Reg. 19812 (May 8, 1992). The statement lists seven criteria that the Commission thought favored characterizing an intrastate journey as part of interstate commerce and ten more criteria that it believed did not detract from that characterization. So for example the fact that the warehouse was owned by the shipper was said to support characterizing the intrastate journey as part of interstate commerce but the fact that the warehouse was not owned by the shipper was said not to detract from that characterization. Are those two criteria or one? We don't know; and we can't see the relevance of whether the warehouse is owned, leased, shared, or for that matter stolen, given that the object of the statutory exemption is to shift regulation of truckers' hours from the Labor Department to the Department of Transportation if the truckers participate in interstate transportation, and what has that to do with where title to the warehouse resides? And no weighting of the criteria is suggested.

At least four of the criteria listed, however, make sense, and they are sufficient to enable us to dispose of this case without getting deeper into the regulation and the policy statement. The four are that (1) the shipper, although it doesn't have to have lined up its ultimate customers when the product arrives at the warehouse, "bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis"; (2) "no processing or substantial product modification of substance occurs at the warehouse"; (3) "while in the ware-

house, the merchandise is subject to the shipper's control and direction as to the subsequent transportation"; and (4) "the shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier" (this goes to the shipper's responsibility for the original interstate journey). If these conditions are satisfied, the intrastate leg at the end of the shipment should be deemed part of an interstate shipment.

Antiquarians will note at least a faint resemblance between our suggested approach and the "original package" doctrine of *Low v. Austin*, 80 U.S. (13 Wall.) 29 (1872), overruled by *Michelin Tire Corp. v. Wages*, 423 U.S. 276 (1976). Article I, § 10, cl. 2 of the Constitution forbids a state to tax imports or exports, and the Supreme Court had held in *Low* that until an imported good was removed from the package in which it had been shipped to the United States it could not be taxed. Removal from the original package, which the Court thought ended the importation phase of the good's journey from foreign origin to ultimate U.S. destination, would correspond in the present case to processing wine at Heritage's warehouse. Both events are interruptions usable to demarcate foreign (or in this case foreign and interstate) commerce from domestic (in this case intrastate) commerce. The particular demarcation in *Low* was rejected in *Michelin*, which held that a state ad valorem property tax (a tax based on the assessed value of property) that did not discriminate against imported goods—the tax applied to goods inventoried in the

state regardless of their origin—did not offend against the policy of the import-export clause.

The Court had earlier rejected the use of the "original package" doctrine to decide whether shipments are in interstate commerce, *Sonneborn Bros. v. Cureton*, 262 U.S. 506 (1923), because, as in *Michelin*, the challenged state tax did not discriminate against goods from out of state. But in our case, as in other cases in which the question is not whether a transaction burdens or otherwise affects interstate commerce but whether it is "in" interstate commerce, there is no alternative to deciding at what point a good should no longer be said to have been transported from a point in one state to a point in another. A point must be chosen at which the good may be said to "come to rest"—to have ceased to be "in practical continuity with a larger interstate journey," *Packard v. Pittsburgh Transportation Co.*, 418 F.3d 246, 258 (3d Cir. 2005)—to have left the "stream of interstate [or foreign] commerce," *United States v. Yellow Cab Co.*, 332 U.S. 218, 228-29 (1947), overruled on other grounds by *Copperweld Corp. v. Independence Tube Corp.*, 467 U.S. 752 (1984); see also *Western Oil Refining Co. v. Lipscomb*, 244 U.S. 346, 349 (1917)—so that its further journey is outside the scope of the Motor Carrier Act. The point must be chosen, however inescapably arbitrary the process of choice, in order to decide the case, because before that point is reached the journey is subject to the Motor Carrier Act and after it is not.

Attempting to base decision on seventeen unweighted technical criteria to be applied by generalist judges who

are not told what the relevance of any of the criteria is but have to figure it out for themselves is unlikely to improve the prospects for objectively deciding whether a particular intrastate shipment should be deemed to be "in commerce." The multicriteria approach is likely to condemn the judges to wander forlornly in the untracked wilderness named "the totality of the circumstances," a phrase found in many of the cases involving the Motor Carrier Act's exemption for interstate transportation. The present case can be decided by using an approach that is simpler to apply than the multicriteria test yet maintains consistency with most of the cases and official texts. Other cases may require a more complex approach, and if so, fine; this case does not.

We end with the plaintiffs' back-up argument for reversal. Between 2005 and 2008 the Motor Carrier Act limited the definition of "motor carriers" to carriers that provide transportation by (so far as bears on this case) a truck that weighs at least 10,001 pounds. 49 U.S.C. § 31132(1)(A). Some of the plaintiffs occasionally drove lighter trucks, and they argue that when they were doing that they were covered by the Fair Labor Standards Act. But to divide jurisdiction in this way would be contrary to the Supreme Court's sensible decision in *Morris v. McComb*, 332 U.S. 422 (1947), which held that the employer of a driver who may sometimes be required to deliver goods in interstate commerce is subject to the Motor Carrier Act even if most of his driving is intrastate. Cf. *Levinson v. Spector Motor Service*, *supra*; 29 C.F.R. § 782.2(b)(3). Dividing jurisdiction over the same drivers, with the result that their

employer would be regulated under the Motor Carrier Act when they were driving the big trucks and under the Fair Labor Standards Act when they were driving trucks that might weigh only a pound less, would require burdensome record-keeping, create confusion, and give rise to mistakes and disputes.

AFFIRMED.