10-4569-cv
Lyons v. Lancer Insurance Co.

UNITED STATES COURT OF APPEALS

FOR THE SECOND CIRCUIT

- - - - - -

August Term, 2011

(Argued:  November 16, 2011                    Decided: May 21, 2012)

Docket No. 10-4569-cv

_____

THOMAS E. LYONS and CELESTE M. LYONS,

Plaintiffs-Appellants,

- v. -

LANCER INSURANCE COMPANY,

Defendant-Appellee.
_____

Before:  KEARSE and RAGGI, Circuit Judges, and KAHN, District Judge[*].

Appeal from a judgment of the United States District Court for the Southern District of New York, dismissing complaint seeking a declaration that federal law requires defendant insurer to satisfy an unpaid judgment entered in favor of plaintiffs in a negligence action against defendant's insured for an accident that occurred on an intrastate trip.  See 2010 WL 6442153 (Oct. 20, 2010).

Affirmed.

_____

[*]    Honorable Lawrence E. Kahn, of the United States District Court for the Northern District of New York, sitting by designation.

EDWARD J. CARROLL, Kingston, New York, for
Plaintiffs-Appellants.

ROY W. VASILE, Merrick, New York (Curtis, Vasile, Merrick, New York, on the brief), for Defendant-Appellee.

KEARSE, Circuit Judge:

Plaintiffs Thomas E. Lyons ("Mr. Lyons") and Celeste M. Lyons (collectively "Lyons"), who were awarded a judgment in August 2006 in a state-court negligence action (the "Negligence Action Judgment") against T.F.D. Bus Company ("TFD" or "T.F.D."), one of whose buses had struck a vehicle operated by Mr. Lyons, appeal from a judgment of the United States District Court for the Southern District of New York, Warren W. Eginton, District Judge[**], dismissing their complaint seeking a judgment declaring that defendant Lancer Insurance Company ("Lancer"), an insurer of TFD, is obligated to pay each plaintiff $5,000,000 or more in satisfaction of the essentially unpaid Negligence Action Judgment, and ordering Lancer to pay those amounts. The district court granted Lancer's motion for summary judgment dismissing the complaint on the ground that the relevant insurance coverage was limited to interstate trips and that the TFD bus trip that resulted in Mr. Lyons's injury was a trip wholly within New York State. On appeal, plaintiffs contend that the district court erred in granting summary judgment against, rather than for, them, arguing principally that the bus that struck the Lyons vehicle was supposed to have been traveling on an interstate mission. For the reasons that follow, we affirm the judgment of the district court.

---

[**] Senior Judge of the United States District Court for the District of Connecticut, sitting by designation.

# I. BACKGROUND

The relevant facts do not appear to be in dispute. The following description of the events is taken largely from the statement each side submitted pursuant to Local Rule 56.1 ("Rule 56.1 Statement") in connection with Lancer's motion for summary judgment, and from the undisputed evidence underlying the district court's summary judgment opinion, Lyons v. Lancer Insurance Co., No. 7:07-cv-7095, 2010 WL 6442153 (S.D.N.Y. Oct. 20, 2010) ("District Court Opinion"); see id. at *1 n.1 ("Because the parties agree about most facts underlying this dispute, the Court will accept all cited evidence, except for any logical or legal conclusions contained in the various statements.").

A. TFD and the February 14, 1989 Accident

In 1989, TFD, which ceased business operations in 2007, was a private interstate common carrier based in Mount Vernon, New York, authorized to provide commercial transportation of passengers in any of the contiguous States of the United States. Some 85 percent of its revenues came from operating school buses pursuant to contracts with nearby school districts in New York State, principally for public schools in Mount Vernon, New Rochelle, and Yonkers. TFD owned 90-odd vehicles, including yellow school buses, other buses, cars, and minivans. The yellow school buses were also used for other purposes, such as private charters that represented approximately five percent of TFD's business.

During 1989, Michael A. Thomas ("Thomas" or "Michael Thomas") was employed by TFD as a bus driver. In the 1988-89 school year, Thomas was regularly scheduled by TFD to transport students to and from Emerson Junior High School ("Emerson" or "Emerson J.H.S.") in Yonkers, picking them up every morning from three or four specified locations in Yonkers, and returning them to those locations each afternoon after picking them up from Emerson.

3

On the afternoon of February 14, 1989, Thomas drove a TFD yellow school bus with seating capacity for 44 adult passengers, which TFD called "bus 287," to Emerson Junior High School and picked up students to transport them to the usual drop-off locations. At approximately 2:51 p.m., before reaching the first drop-off location, bus 287 collided with the vehicle operated by Mr. Lyons, which was stopped at a red light. As a result of the accident, Mr. Lyons sustained injuries that prompted plaintiffs to commence personal injury litigation against Thomas and TFD. Following, inter alia, a default by TFD in 1992 and a jury trial in 1999 on issues of damages, plaintiffs eventually obtained, to the extent pertinent here, the August 2006 Negligence Action Judgment against TFD, which awarded them a total of $2,470,000, plus interest from 1992. That judgment remains essentially unsatisfied.

B. The Present Action

Federal law required that a motor carrier for hire engaging in the interstate transportation of passengers, e.g., transportation between a place in a State and a place in another State or between two places in the same State but passing through another State, provide evidence of financial responsibility. See Bus Regulatory Reform Act of 1982, Pub. L. No. 97-261, § 18, 96 Stat. 1102, 1120 (1982) ("Bus Act" or "Act") (codified as amended at 49 U.S.C. § 10927, note (1988), renumbered 49 U.S.C. § 31138 in 2006 Code). The Act provided that the Secretary of Transportation (or "Secretary") would establish regulations setting minimum permissible levels of financial responsibility and that, not later than three years after the effective date of the Bus Act, the minimum with respect to a vehicle having a seating capacity of 16 or more passengers would be $5,000,000. See Bus Act §§ 18(b)-(c).

4

Such financial responsibility could be established by evidence of insurance, see id. § 18(d), reflected in an insurance policy endorsement on "Form MCS-90B," 49 C.F.R. § 387.31(d)(1). That form stated that the insurer agreed to pay, within the limits of the policy to which the endorsement was attached, "any final judgment recovered against the insured for public liability resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Section 18 of the Bus Regulatory Reform Act of 1982, regardless of . . . whether or not such negligence occurs on any route or in any territory authorized to be served by the insured or elsewhere." 49 C.F.R. § 387.39 (Illustration I) (emphasis added). In 1989, TFD's buses, including bus 287, were insured by Lancer. The Lancer-TFD insurance policy ("Policy") included the required Form MCS-90B endorsement as quoted above.

In 2007, with the Negligence Action Judgment essentially unsatisfied by TFD, plaintiffs commenced the present action against Lancer seeking a judgment under federal statutory law, including the Bus Act and regulations promulgated thereunder, declaring Lancer obligated to satisfy the Negligence Action Judgment entered in their favor against TFD (Federal Complaint ¶¶ 1-3), and ordering Lancer to pay each plaintiff $5,000,000 or more. Plaintiffs alleged principally that "at the time of the accident," TFD bus 287 "was being used for hire as an interstate transporter" (id. ¶ 12), "during interstate commerce" (id. ¶ 13), and that Lancer was thus obligated by the federally mandated Form MCS-90B endorsement to pay the Negligence Action Judgment.

Following a period of discovery, both sides moved for summary judgment. Plaintiffs, in support of their contention that the 1989 accident occurred while bus 287 was being used on an "interstate" trip, submitted affidavits from Thomas and from former TFD vice president Albert M. Groccia, and excerpts from depositions of Thomas and Groccia taken in 2009.

5

Groccia testified that on the morning of February 14, 1989, TFD had provided charter service to a group of senior citizens in Mount Vernon, taking them to Armonk, New York. (See Deposition of Albert M. Groccia, January 30, 2009 ("Groccia Dep."), at 41-42.) TFD was supposed, that afternoon, to send a bus to Armonk, arriving there at 2 p.m., to bring that group back to Mount Vernon. (See id. at 42-43, 44.) Although both Mount Vernon and Armonk are within New York State, the most efficient route between the two included several miles on Interstate Highway 684 ("I-684") (see id. at 11-13), and part of that stretch of I-684 was in the State of Connecticut (see id. at 13). Groccia testified that that was the route he would have recommended (see id. at 13, 97-100); and Thomas stated in his affidavit that on the occasions when he had driven buses between Mount Vernon and Armonk--before and after the date of the accident--he had "always followed [TFD]'s recommended route," which passed "through the State of Connecticut" (Affidavit of Michael A. Thomas dated June 8, 2009 ("Thomas Aff."), ¶ 4).

Although Groccia testified that he had "[n]o idea how" Thomas came to be the operator of bus 287 on the afternoon of the accident (Groccia Dep. 9; see id. ("I don't know how he became the operator")), Groccia proceeded to testify that on the afternoon of February 14, 1989, Michael Thomas was supposed to have driven bus 287 to Armonk to pick up the senior citizens at 2 p.m. and bring them back to Mount Vernon, rather than to pick up students from Emerson Junior High School in Yonkers (see, e.g., id. at 10-11, 14-15, 39, 44). Groccia stated that if Thomas had gone to Armonk to pick up the senior citizens, he would not have been in Yonkers. (See, e.g., id. at 39, 40, 45.) He also testified that although bus 287 was used "for all kind[s] of work" (id. at 12), it lacked a Yonkers permit that would have authorized it to operate within that city (see id. at 27).

Thomas was employed by TFD for some 20 years beginning in 1982. He testified that he sometimes drove charter buses for TFD and that his regular duty in 1989 was to transport the

6

Emerson students to and from school. The designated Emerson J.H.S. route was entirely within the City of Yonkers. Thomas's "job was to take that route every day." (Deposition of Michael A. Thomas, January 30, 2009 ("Thomas Dep."), at 17; see also Groccia Dep. 33 ("Michael Thomas was assigned to the Emerson run").) Thomas "knew automatically to go to Emerson . . . Junior High School at [sic] the afternoon and pick up a bus load of kids." (Thomas Dep. 14.)

Thomas testified that when there was to be a charter trip, a TFD dispatcher would normally give a driver a dispatch "ticket" (id. at 18) instructing him "where we have to go, who to pick up, so forth" (id. at 11; see, e.g., id. at 19-20, 23). Thomas did not think he was given a dispatch ticket for a charter trip on February 14, 1989. (See id. at 19.) He testified, "I just heard something I was to get a ticket, I didn't get it. That's all I heard." (Id. at 18.) Accordingly, on the afternoon of February 14, 1989, Thomas began his usual routine of picking up the students from Emerson in Yonkers. He drove bus 287, which was the bus he had driven to take the students to school that morning (id. at 30-32).

In support of their motion for summary judgment against Lancer, plaintiffs argued that Thomas's trip to pick up the students from Emerson in Yonkers was part of his trip to pick up the senior citizens from Armonk. In support of that argument, plaintiffs submitted an affidavit from Groccia dated June 4, 2009, stating that although bus 287 was not scheduled to travel through the City of Yonkers, "due to a misunderstanding, Michael A. Thomas also transported a group of students through that city, while operating that bus on its interstate route to Armonk." (Affidavit of Albert M. Groccia dated June 4, 2009, ¶ 6 (emphases added).) However, in their own proffer of undisputed facts, plaintiffs also quoted the following deposition testimony of Groccia who testified that an identical statement appearing in a prior affidavit was not accurate:

7

Q. . . . . The last sentence of that paragraph . . . states . . . [d]ue to a misunderstanding, Michael A. Thomas also transported a group of students through that City, meaning Yonkers, while operating that bus on its interstate route to Armonk. Is that statement accurate?

A. No. He was dispatched to go to Armonk. He was dispatched, that's the way it should have read. He was dispatched to go to Yonkers -- Armonk.

Q. Understood.

A. He went to Yonkers instead of the dispatch to go to Armonk . . . --

. . . .

Q. . . . [E]xactly what is it that you know Michael Thomas did on the day that this accident occurred?

A. He didn't follow dispatch. He went to Yonkers.

(Groccia Dep. 114, 116 (emphases added).)

Groccia also testified that he had no reason to believe that Thomas had driven on any part of I-684 that day:

Q. Okay. At any time during that experience, was there any information that you ever received that would indicate to you that at any time that day Michael Thomas was on any portion of Interstate 684? Did you learn any information ever that on that day while in a TFD Bus, Michael Thomas was driving on Interstate 684?

A. No.

(Groccia Dep. 116; see also Thomas Aff. ¶ 6 ("I found out later that I had been instructed by 'T.F.D[.]' to simply make the return trip of adults from Armonk, New York to Mt. Vernon, New York. I should have simply left Mt. Vernon and traveled directly on the above described route to Armonk, New York."); Groccia Dep. 45 ("if [Thomas] went to Armonk, he wouldn't have been in Yonkers").)

Lancer cross-moved for summary judgment in its favor. In its Rule 56.1 Statement of facts as to which it contended there was no genuine issue to be tried, it asserted, inter alia, (a) that

"Michael Thomas did not drive Bus No. 287 to Armonk at any time on February 14, 1989" (Lancer Rule 56.1 Statement ¶ 15); (b) that "[i]nstead, Michael Thomas drove that bus along the route he usually drove for TFD, specifically, the Emerson Junior High School route" (id. ¶ 16); (c) that "[t]he Emerson J.H.S. route had specific stops along a designated course entirely within the City of Yonkers" (id. ¶ 17); and (d) that "[a]nother driver and another bus undertook to transport the senior citizens back from Armonk to Mt. Vernon" (id. ¶ 20). Plaintiffs expressly admitted all four of these assertions, although they argued as to paragraphs 15, 16, and 20 that the reason that Thomas did not drive to Armonk--and the reason that another TFD bus was dispatched on that mission--was that Thomas's trip was interrupted by his bus's collision with the Lyons vehicle. They also argued that the reason Thomas went to Emerson was that he erred in not carrying out TFD's intent that he drive to Armonk on a foreseeable trip through the State of Connecticut.

## C. The District Court's Decision

The district court denied plaintiffs' motion for summary judgment and granted the summary judgment motion of Lancer. The court noted plaintiffs' contention "that Thomas's transportation of the student[s] was erroneous and part of a larger interstate trip," and Lancer's contrary contention "that the Emerson trip and the Armonk-Mount Vernon trip were two separate and distinct trips." District Court Opinion, 2010 WL 6442153, at *2. The court discussed the above testimony that TFD had dispatched Thomas to Armonk and observed that in fact

> Thomas did not go to Armonk that day. Instead, he drove a bus route for Emerson Junior High School in Yonkers, which was his usual route. Plaintiff contends that this was done in error and TFD's "persistent intent" was for bus 287 to make the Armonk-Mount Vernon trip. Groccia averred that this was due to a misunderstanding and that Thomas was supposed to be operating the bus on the interstate route from Armonk.FN2 Groccia further testified that Thomas did not follow dispatch in going to Yonkers.

9

> FN2. At his deposition, Groccia commented that his affidavit was incorrect. Groccia testified that Thomas "went to Yonkers instead of the dispatch to go to Armonk."

Id. at *1 & n.2 (emphases added).

The court pointed out that "[g]enerally, the MCS-90[B] endorsement applies when transportation is interstate in nature" and stated that if a motor carrier's trip crosses a State line it is an interstate trip, whereas if the trip is entirely within a single State, it is not an interstate trip. Id. at *3. The court concluded that the trip in question was an intrastate, not an interstate, trip:

> In this case, the school children are the relevant "goods" being shipped. They were transported entirely within New York. Any subsequent trip to transport the senior citizens was a second, unrelated trip. Therefore, as a matter of law, the [Yonkers] run was not an interstate run no matter TFD's later intention for Thomas and bus 287. The "goods" in the Yonkers run were to remain entirely within Yonkers. This single fact leads to the conclusion that the Emerson run was not interstate. Summary judgment is appropriate in favor of defendant.

Id. (emphasis added).

## II. DISCUSSION

On appeal, plaintiffs contend that summary judgment in favor of Lancer, rather than plaintiffs, was error, arguing principally that when the accident occurred, TFD bus 287 was on an interstate trip (see, e.g., Lyons brief on appeal at 15, 16, 18, 29, 35, 36-37, 49, 50, 57, 59) because "the fixed and persisting intent of the shipper that existed at the time of the dispatch was that bus 287 was to perform an interstate trip involving the transportation of senior citizens" (id. at 57; see, e.g., id. at 16, 48 (characterizing "T.F.D. as the shipper")). Plaintiffs contend that the district court erred in "assum[ing]" and "claiming" that there were or could have been "two trips" on the afternoon of February 14, 1989, instead of one interstate trip encompassing both Yonkers and Armonk (id. at 59);

10

they argue that "[t]here was no factual basis upon which a jury could determine that two trips were involved or that bus 287 was not engaged in interstate transportation" (id.). We disagree.

A. Summary Judgment Principles

Summary judgment is appropriate only if "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). In determining whether the moving party is entitled to judgment as a matter of law, the court must draw all reasonable factual inferences in favor of the party against whom summary judgment is sought. See, e.g., Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986) ("Liberty Lobby"); United States v. Diebold, Inc., 369 U.S. 654, 655 (1962); Law Debenture Trust Co. of New York v. Maverick Tube Corp., 595 F.3d 458, 468 (2d Cir. 2010) ("Law Debenture"). In order to defeat a motion for summary judgment, the opposing party must adduce "evidence on which the jury could reasonably find for th[at party]," Liberty Lobby, 477 U.S. at 252; "[t]he mere existence of a scintilla of evidence in support of the [opposing party's] position will be insufficient," id. If the opposing party's proffered "evidence is merely colorable . . . or is not significantly probative . . . summary judgment may be granted." Id. at 249-50. "When both sides have moved for summary judgment, 'each party's motion must be examined on its own merits, and in each case all reasonable inferences must be drawn against the party whose motion is under consideration.'" Law Debenture, 595 F.3d at 468 (quoting Morales v. Quintel Entertainment, Inc., 249 F.3d 115, 121 (2d Cir. 2001)); see, e.g., Wachovia Bank, National Association v. VCG Special Opportunities Master Fund, Ltd., 661 F.3d 164, 171 (2d Cir. 2011) ("Wachovia Bank").

In ruling on a motion for summary judgment, the district court may rely on "any material that would be admissible" at a trial. Major League Baseball Properties, Inc. v. Salvino, Inc.,

11

542 F.3d 290, 309 (2d Cir. 2008) (internal quotation marks omitted); see, e.g., Raskin v. Wyatt Co., 125 F.3d 55, 66 (2d Cir. 1997); Azrielli v. Cohen Law Offices, 21 F.3d 512, 517 (2d Cir. 1994); 10A C. Wright, A. Miller & M. Kane, Federal Practice and Procedure: Civil § 2721 at 361 (3d ed. 1998); see generally Fed. R. Civ. P. 56(c)(2). In determining whether the moving party is entitled to judgment as a matter of law, the district court may not properly focus on individual strands of evidence and consider the record in piecemeal fashion; rather, it must consider "all of the evidence in the record," Reeves v. Sanderson Plumbing Products, Inc., 530 U.S. 133, 150 (2000), "review[ing] the record 'taken as a whole,'" id. (quoting Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986)).

The same principles apply to our standard for reviewing the grant or denial of summary judgment. See, e.g., Wachovia Bank, 661 F.3d at 171; Fabozzi v. Lexington Insurance Co., 601 F.3d 88, 90 (2d Cir. 2010); Law Debenture, 595 F.3d at 468.

B.      Federal Regulation of Motor Carriers Transporting Passengers
        for Hire

As indicated in Part I.B. above, § 18 of the 1982 Bus Act, which was applicable at the time of the accident at issue here, required the promulgation of financial responsibility regulations to apply to "the transportation of passengers for hire by motor vehicle in the United States from a place in a State to a place in another State" or "from a place in a State to another place in such State through a place outside of such State," or "between a place in a State and a place outside of the United States." Bus Act § 18(a) (emphases added). Pursuant to this authority, the Secretary of Transportation issued regulations requiring, inter alia, that an insurance policy, to evince such responsibility, include the MCS-90B endorsement requiring the insurer to pay, within the limits of the policy, "any final

12

judgment recovered against the insured" for personal injury to a member of the public or property damage "resulting from negligence in the operation, maintenance or use of motor vehicles subject to the financial responsibility requirements of Section 18 of the Bus Regulatory Reform Act of 1982," 49 C.F.R. § 387.39 (Illustration I).

Neither party has called to our attention any cases--nor are we aware of any--dealing with the applicability of an MCS-90B endorsement in circumstances such as those at issue here, where a carrier's vehicle was involved in an accident while performing a contract that called for travel solely intrastate and where the carrier had an unrelated contract that would likely involve travel between two places in the same State over a route passing through a second State. In various contexts relating to the transport of property, involving such questions as whether a particular vehicle or driver was covered by an MCS-90 endorsement (which, for vehicles transporting goods rather than passengers, parallels the MCS-90B endorsement, see, e.g., Canal Insurance Co. v. Coleman, 625 F.3d 244, 249 (5th Cir. 2010)), see, e.g., The Integral Insurance Co. v. Lawrence Fulbright Trucking, Inc., 930 F.2d 258, 260-62 (2d Cir. 1991); Century Indemnity Co. v. Carlson, 133 F.3d 591, 595 (8th Cir. 1998), or whether a motor carrier's employees are exempt from federal wage-and-hour requirements because the carrier's business as a whole is regulated by the Secretary of Transportation, see, e.g., Bilyou v. Dutchess Beer Distributors, Inc., 300 F.3d 217, 221-22 (2d Cir. 2002) ("Bilyou"); Collins v. Heritage Wine Cellars, Ltd., 589 F.3d 895, 896-97 (7th Cir. 2009); Klitzke v. Steiner Corp., 110 F.3d 1465, 1467-68 (9th Cir. 1997), this Court and others have noted that the existence of the requisite interstate nexus may be determined by looking to the intent of the goods' seller or shipper with respect to the goods' destination:

> Whether the transportation is of an interstate nature can be "determined by reference to the intended final destination" of the transportation when that ultimate destination was envisaged at the time the transportation commenced.

*Project Hope [v. M/V Ibn Sina]*, 250 F.3d [67, 74 (2d Cir. 2001)]; see also *Atlantic Coast Line [R. Co. v. Standard Oil Co. of Kentucky]*, 275 U.S. [257, 269 (1927)] (determining continuity of transportation by examining whether the destination of the goods "is arranged for or fixed in the minds of the sellers"); *Klitzke v. Steiner Corp.*, 110 F.3d 1465, 1469 (9th Cir. 1997) ("Whether transportation is interstate or intrastate is determined by the essential character of the commerce, manifested by shipper's fixed and persisting transportation intent at the time of the shipment. . . .") (citation omitted) (emphasis in original); *Foxworthy[ v. Hiland Dairy Co.]*, 997 F.2d [670, 672 (10th Cir. 1993)] ("Crucial to a determination of the essential character of a shipment is the shipper's fixed and persisting intent at the time of shipment.") (quotation marks and citation omitted); 29 C.F.R. § 782.7(b)(2) (intrastate transportation can satisfy the interstate commerce requirement of the M[otor Carriers Act] if the shipper has a "fixed and persisting transportation intent beyond the terminal storage point at the time of shipment").

*Bilyou*, 300 F.3d at 223-24 (second emphasis in original) (other emphases added).

Plaintiffs cite most of these cases and characterize the bus that collided with the Lyons vehicle as having commenced an interstate trip, pointing out that bus 287 was not licensed to operate in the City of Yonkers and arguing that TFD had a "fixed and persisting intent" to send bus 287 to Armonk to bring the senior citizens back to Mount Vernon. Thus, characterizing the Emerson students as "goods," plaintiffs argue that the nature of

the goods being transported does not determine whether the trip was of an interstate or intrastate nature since their transportation was unauthorized and only involved a portion of that interstate trip which was performed by the driver without authority and contrary to the fixed and persisting intent of the shipper at the time of dispatch of bus 287.

. . . .

. . . [B]us 287 was only dispatched because T.F.D. had procured and begun performance of an interstate contract with senior citizens and . . . the fixed and persisting intent of T.F.D., as a shipper, at the time of bus 287's dispatch, was that bus 287 would be engaged in interstate transportation of those senior citizens with a final intended destination of Mount Vernon.

(Lyons brief on appeal at 58 (emphases added).) We reject these contentions as analytically flawed and lacking in evidentiary foundation.

14

First, plaintiffs' characterization of "T.F.D. as the shipper" (Lyons brief on appeal at 16, 48; see, e.g., id. at 18, 19, 23, 24, 25, 26, 29, 58), is analytically unsound. TFD was not a shipper; it was a carrier. The shipper is the entity that purchases the transportation services of the carrier. Further, the term "shipper" is not normally associated with passenger travel. For example, federal regulations define various categories of shippers with respect to shipments of goods, see, e.g., 49 C.F.R. § 375.103, referred to in 49 C.F.R. § 387.301(b), whereas regulations applicable to "Motor Carriers of Passengers," see, e.g., 49 C.F.R. § 387.29, do not mention or otherwise refer to shippers. See generally S. Sorkin, Goods in Transit § 3.03 (2011) ("It has been held that the destination intended by the passenger or shipper at the commencement of the journey or shipment and known to the carrier determines the character of the commerce." (emphases added)).

Assuming that "shipper" is a concept applicable to non-adult passengers, the shippers of the students to and from Emerson Junior High School would have been the students' parents and the school. As there is no dispute that TFD's route to pick up and drop off those students was "entirely within the City of Yonkers" (Rule 56.1 Statements ¶ 17), no rational juror could find that the parents or the school intended that the school bus, in transporting the students between the school and the specified drop-off locations, would travel through a State other than New York.

Nonetheless, we cannot say that the plans or actions of the carrier itself will never have a bearing on whether a trip is interstate or intrastate, for we doubt that the parents or the school would have any interest in the bus's itinerary after all of the students were dropped off at the prearranged locations. And viewing the record in the light most favorable to plaintiffs and drawing reasonable inferences in their favor, we accept that a TFD bus's route between Armonk and Mount Vernon would have been through Connecticut. Thus, our conclusion as to the intent of the parents and the school leaves open the question--discussed below--of whether on the afternoon of February 14, 1989, bus

15

287, if it had completed its transport of the students in Yonkers, was to have been driven to Armonk to pick up the senior citizens.

Second, plaintiffs' description of the students' "transportation []as unauthorized" is contrary to the record. Although it is beyond dispute that TFD had a charter contract to transport the senior citizens back to Mount Vernon from Armonk, it is also indisputable that TFD had a contract with Yonkers or the Yonkers school district to transport students to and from Emerson Junior High School. Further, although it is undisputed that bus 287 was unlicensed by the City of Yonkers to operate in Yonkers, that fact does not support an inference that that bus was dispatched to Armonk. There is nothing in the record to suggest that bus 287 was the bus that had transported the senior citizens to Armonk that morning; indeed, the evidence is to the contrary, as Thomas testified that that was the bus he had used to take the students to Emerson that morning (see Thomas Dep. 30-32). Plaintiffs have pointed to no evidence to the contrary. The uncontradicted evidence that bus 287 was used in Yonkers on the morning of February 14, 1989, defeats plaintiffs' theory that, on that afternoon, bus 287 could "only" have been dispatched to go to Armonk.

Although plaintiffs suggest that the senior citizens had an intent to travel "interstate" (see Lyons brief on appeal at 49)--and one could reasonably infer that the senior citizens intended that they would be transported between Mount Vernon and Armonk over the most efficient route, i.e., through Connecticut--such an intent provides no basis for an inference that that interstate trip was to be carried out by bus 287. There is no evidence whatever that the senior citizens had arranged for bus 287--or any particular bus--for their trip to or from Armonk. Further, even if the senior citizens expected to be brought home on the same bus that had taken them to Armonk, the evidence, as discussed above, is that the bus that had taken them to Armonk in the morning was not bus 287.

Finally, although plaintiffs argue, apparently as an alternative, that the trip to pick up and drop off the Emerson students after school was "only . . . a portion of [an] interstate trip" to

16

Armonk (Lyons brief on appeal at 58), that Thomas "began [an] interstate trip [to Armonk] by picking up and transporting a group of students through the City of Yonkers where he intended to discharge them at three stops" (id. at 15; see, e.g., id. at 50), and that even if Thomas had completed his transport of the Emerson students that afternoon he had "ample time" to "pick[] up and return[] th[]e senior citizens from Armonk through Connecticut to Mount Vernon" (id. at 15-16), no rational juror could so find. Groccia testified that the senior citizens were to be picked up in Armonk at 2 p.m.; plaintiffs have not pointed to any evidence to suggest a different pick-up time. The police report showed that the time of the accident in Yonkers was 2:51 p.m. When the accident occurred, Thomas had yet to reach even the first of the several drop-off locations for the students. And as Groccia testified, if Thomas had gone to Armonk, he would not have been in Yonkers. No rational juror could find that only a single trip was intended to fulfill both TFD's contract to transport the students after school in Yonkers and its contract to pick up the senior citizens in Armonk at 2 p.m.

We conclude that the district court did not err in ruling that Lancer was entitled to judgment as a matter of law on the basis of the evidence that TFD had to have intended two trips in order to perform both its Yonkers and its Armonk-to-Mount Vernon obligations, that the accident occurred on the trip that was wholly intrastate, and that the MCS-90B endorsement therefore did not apply.

Plaintiffs also argue, as an alternative to their contention that bus 287 was, or should have been, on an interstate trip at the time of the accident, that the MCS-90B endorsement imposes federal liability on Lancer even if bus 287 was on a purely intrastate trip. In support of that contention, they rely principally on two district court cases, Reliance National Insurance Co. v. Royal Indemnity Co., No. 99 Civ. 10920, 2001 WL 984737 (S.D.N.Y. Aug. 24, 2001) ("Reliance"), and Insurance Corp. of New York v. Monroe Bus Corp., 491 F.Supp.2d 430 (S.D.N.Y. 2007) ("Insurance Corp."), which not only are not binding on us but also bear no significant similarity to the present

17

case. In Reliance, the district court was called on principally to unravel the interrelated obligations of five insurance companies with regard to various theories of vicarious liability where an "interstate carrier" had "sign[ed] an exclusive lease with a trucker" for the trucker's services "to perform interstate transport" for some six months using his own tractor and a trailer provided by the interstate carrier; and the tractor-trailer, displaying the carrier's interstate permit, was involved in an accident "while the trucker perform[ed] a single intrastate transport," 2001 WL 984737, at *6. The insurer for the carrier disclaimed coverage for the trucker on the ground that the accident occurred on a trip that was wholly intrastate. However, as the intrastate trip was aberrational, the court ruled that the proper focus was not on that trip but rather on the relationship between the trucker and the carrier, see id. at *4, and that the carrier's insurer's MCS-90 endorsement covered the trucker because it was "clear that [the carrier] intended to procure [the trucker]'s services for interstate transport," id. at *6. And in Insurance Corp., the principal issues were whether the insurer ("InsCorp")--which had paid a judgment against the insured and was seeking indemnification--had been given proper notice of the claim against the insured and whether federal law preempted state-law principles with respect to disclaimers based on lack of notice. The court was not presented with an intrastate-coverage issue, given that "[i]n seeking [indemnification], InsCorp ma[de] a three-part argument," the first part of which was in fact that "it was obligated to pay the [injured party's] judgment by virtue of the Endorsement," 491 F.Supp.2d at 433 (emphases added).

Plaintiffs also argue that Lancer is federally liable with respect to an accident on an intrastate trip because the MCS-90B endorsement attached to the Policy was accompanied by "Forms E and F." (E.g., Lyons brief on appeal at 42.) We see no merit in this argument. Form F--the record does not indicate that plaintiffs submitted a Form E to the district court--deals with "proof of financial responsibility under the provisions of any State motor carrier law or regulations promulgated by any State Commission having jurisdiction" and assures coverage "in accordance with the

18

provisions of <u>such</u> law or regulations to the extent of the coverage and limits of liability required <u>thereby</u>." (Policy Form F (emphases added).) Neither Form F nor any of the authorities cited by plaintiffs persuades us that the MCS-90B endorsement required by "Section 18 of the Bus Regulatory Reform Act of 1982," 49 C.F.R. § 387.39 (Illustration I)--a statutory section whose scope is expressed in terms of passenger transport that crosses one or more State boundaries--applies to an accident of a primarily intrastate carrier on a trip that neither did nor was intended to cross a State border.

In light of the above conclusions, we need not reach alternative bases for affirmance argued by Lancer.

CONCLUSION

We have considered all of plaintiffs' arguments on this appeal and have found them to be without merit. The judgment of the district court dismissing the complaint is affirmed.