In the

# United States Court of Appeals

## For the Seventh Circuit

———————————

Nos. 24-1612 & 24-1613

RENEE STINGLEY, *et al.*,

*Plaintiffs-Appellants*,

*v.*

LACI TRANSPORT INC., *et al.*,

*Defendants-Appellees*.

———————————

MARTANEZE JOHNSON, *et al.*,

*Plaintiffs-Appellants*,

*v.*

BOSMAN TRUCKING, INC., *et al.*,

*Defendants-Appellees*.

———————————

Appeals from the United States District Court for the
Northern District of Illinois, Eastern Division.
Nos. 18-cv-06221 & 19-cv-02066 — **John F. Kness**, *Judge*.

———————————

ARGUED DECEMBER 5, 2024 — DECIDED APRIL 2, 2026

———————————

Before ROVNER, SYKES, and ST. EVE, *Circuit Judges*.

ROVNER, *Circuit Judge*. The plaintiffs in these class action lawsuits, which have been consolidated for disposition, are current and former shuttle truck drivers who drive routes entirely within Illinois, moving truckloads of automobile parts that were fabricated outside Illinois and their custom storage containers, to and from a Ford Motor Company ("Ford") assembly plant in Chicago. They filed class action suits against the defendants alleging that the failure to pay them overtime wages violated the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§ 201 *et seq.*, the Illinois Minimum Wage Law, 820 ILCS § 105/1 *et seq.*, and the Chicago Minimum Wage Law, Municipal Code of Chicago (formerly § 1-24, now § 6-105). Resolution of all of those claims turns on resolution of the FLSA claim. The district court granted summary judgment in favor of the defendants, and the plaintiffs now appeal.

The basic facts relevant to these consolidated cases are stipulated by the parties as follows. Ford assembles vehicles at its Chicago Assembly Plant (the "Assembly Plant") located at 12600 S. Torrence Avenue, Chicago, Illinois. Some of the auto parts used at the Assembly Plant are manufactured out of state at Ford's own manufacturing plants outside Illinois as well as at third-party manufacturing plants outside Illinois, specifically for use at the Assembly Plant, based on Ford's projections, forecasts, and estimated need for those specific parts at the Assembly Plant. Those parts are transported by interstate trucking carriers. Ford selects, contracts with, pays, and schedules those interstate truck carriers. When those auto parts are not in immediate need at the Assembly Plant, the deliveries by those interstate trucking carriers are directed to certain semi-trailer storage lots which Ford owns, leases, or

otherwise controls. Those storage lots are at separate locations that are geographically near the Assembly Plant. Plaintiffs in both of the cases that are consolidated today stipulated that the addresses of those storage lots included the following locations: West Lot, 2503 East 130th Street, Chicago, Illinois 60633; Stony Drop Yard, 12200 S. Paxton Avenue, Chicago, Illinois 60633; TC Lot, 12009 S. Ewing Avenue, Chicago, Illinois 60617; South Lot, 13535 S. Torrence Avenue, Chicago, Illinois 60633; Tower, 12350 S. Avenue O, Chicago, Illinois 60633; Campus, 12249 and 12243 S. Burley Avenue, Chicago, Illinois 60633; and 3400 E. 126th Place, Chicago, Illinois 60633. The suit involving the Boseman Trucking defendants included as well the following locations as storage facilities: Dakota, 12523 South Carondolet Avenue, Chicago, Illinois 60633; Chicago Stamping Plant, 1000 Lincoln Hwy., Chicago Heights, Illinois 60411; and MOD Center, Alsip, Illinois. For the purpose of this consolidated action, we focus on the storage lots that are in common.

Those storage lots are used to stage trailers of auto parts manufactured out of state while awaiting transport to the Assembly Plant, so that trailers of parts not scheduled for immediate use at the Assembly Plant do not take up space at the Assembly Plant. Ford tracks the location and contents of each trailer of out of state parts while they are temporarily stored at the storage lots. Most of the auto parts manufactured out of state are not processed, assembled, or comingled with other parts while temporarily stored in trailers at the storage lots. Within two or three days after their arrival at the storage lots, most of the trailers containing those parts are transported to the Assembly Plant by the plaintiff shuttle truck drivers. Eventually, and as needed, all of the trailers staged at the storage lots are transported to the Assembly Plants for use of the

parts on the assembly lines. The plaintiff shuttle truck drivers transport those trailers from the storage lots to the Assembly Plant on public roads, and after the parts are unloaded, they transport the trailers back to the storage lots. Within two or three days, the interstate carriers then pick up the trailers, which still contain the custom shipping racks and containers for the shipment of the auto parts, from those storage lots and return them to the manufacturing plants, where they can be used again to transport such parts. Ford is the "shipper" of empty racks and containers transported from the Assembly Plant to Ford's out of state parts manufacturing plants or other third-party manufacturers, and Ford tracks each semi-trailer containing empty auto part racks and containers arriving at and leaving the storage lots.

The plaintiffs allege that the defendants failed to pay them overtime wages as is required by the FLSA, which requires overtime pay for any employee who works more than 40 hours in a workweek. 29 U.S.C. § 207(a)(1). The statute, however, exempts from its overtime provisions employees "with respect to whom the Secretary of Transportation has power to establish qualifications and maximum hours of service pursuant to the provisions of § 31502 of Title 49" of the Motor Carrier Act ("MCA"). 29 U.S.C. § 213(b)(1); *Collins v. Heritage Wine Cellars, Ltd.*, 589 F.3d 895, 897 (7th Cir. 2009); *Burlaka v. Contract Transport Services LLC*, 971 F.3d 718, 719 (7th Cir. 2020). That section of the MCA allows the Secretary of Transportation to "establish qualifications and maximum hours of service for employees of a motor carrier if 'property … [is] transported by [the] motor carrier between a place in a State and a place in another State,' 49 U.S.C. §§ 13501(1)(A), 31502(b), provided that the employees 'engage in activities of a character directly affecting the safety of operation of motor

vehicles in the transportation on the public highways of passengers or property in interstate or foreign commerce within the meaning of the Motor Carrier Act.'" *Collins*, 589 F.3d at 897, quoting 29 C.F.R. § 782.2(a).

The critical question for the summary judgment motions in this case was whether the MCA excused the defendants from paying overtime wages, that would otherwise be required by the FLSA, to those shuttle drivers that handled the transportation from the storage lots to the Assembly Plant and returned the trailers with the now-empty specialized racks back to the storage lots once the parts were unloaded. As the above language of the FLSA and MCA makes clear, the availability of overtime wages for truck drivers can depend upon whether the routes to which they are assigned are interstate or intrastate ones. In order to deter interstate drivers from driving extra hours, thereby impeding the safety of those on the roads, the MCA prohibits the payment of overtime wages. *Burlaka*, 971 F.3d at 719. Even those who drive intrastate routes, however, such as the plaintiffs here, can fall under the MCA exemption. That is because "[t]he scope of an interstate commerce run under the MCA … includes a purely intrastate run so long as it is a part of a continuous interstate journey," [and] "[t]his continuity is not broken by routine interruptions that 'are no more than the normal stops or stages that are common in interstate sales.'" *Id.* at 720, quoting *Collins*, 589 F.3d at 898. "'[I]f the halt in the movement of goods is a convenient intermediate step in the process of getting them to their final destinations, they remain "in commerce" until they reach those points.'" *Id.*, quoting *Walling v. Jacksonville Paper Co.*, 317 U.S. 564, 568 (1943).

Thus, the availability of overtime wages here turns on whether the intrastate routes are part of a continuous interstate journey. But the term "continuous" has a broader meaning than the common understanding of that term would suggest. The focus is on when the goods "ceased to be in practical continuity with a larger interstate journey." (internal quotation marks omitted) *Collins*, 589 F.3d at 900. We addressed the impact of a temporary stop for storage, before completing the journey, in *Collins.*

In *Collins*, we held that if a wine shipper intended to ship its wine from out of state to a wholesale distributor in the Chicago suburb, and title passed to the distributor when the wine arrived at the distributor's warehouse, then the subsequent delivery of such wine by the distributor to retail stores with which it contracted would be classified as intrastate shipments. *Id*. The original interstate shipment in that scenario was fulfilled when the shipment arrived at its intended destination to the distributor. On the other hand, if a shipper contracted to provide wine to a retail store, and in the course of that shipment the wine was loaded from one carrier to the other, with the second one operating entirely within the state of the final destination, the use of the second carrier would "be as inconsequential as the fact that en route to the store the truck had stopped for a red light." *Id*. The shipment would be an interstate shipment even though one of the carriers that was used operated solely intrastate.

*Collins* further held that even the storage of the wine in a warehouse pending arrival to the final destination did not prevent the subsequent shipment from being part of the same interstate journey. In *Collins*, Heritage shipped wine to warehouses in Illinois. About a fourth of the wine shipped to the

warehouse in Illinois had been ordered in advance by retail stores. *Id*. at 898. The wine was briefly stored in the warehouse by Heritage because Heritage had an order in hand from retail stores for such wine, and we held that "the fact that the wine pauses in its Heritage-controlled journey to the retail outlet is of no greater consequence than the unloading and reloading of [] shipped goods. …" *Id*. As to the remaining wine for which no such pre-existing retail contract existed, Heritage purchased and shipped that wine based on its estimates of customer demands, and none of the wine underwent any alteration on its trip from the vineyard to the retail stores. *Id*. We held in *Collins* that "when a shipper transports his product across state lines for sale by him to customers in the destination state, and the product undergoes no alteration during its journey to the shipper's customers, and interruptions in the journey that occur in the destination state are no more than the normal stops or stages that are common in interstate sales, such as temporary warehousing, the entire journey should be regarded as having taken place in interstate commerce within the meaning of the Motor Carrier Act's exemption from the Fair Labor Standards Act." *Id*.

The relevant distinction, then, in separating intrastate from interstate transportation in such a scenario is whether the shipper had a fixed and persisting transportation intent beyond the terminal storage point at the time of shipment. In making that determination in *Collins*, we considered four criteria: "(1) the shipper, although it doesn't have to have lined up its ultimate customers when the product arrives at the warehouse, 'bases its determination of the total volume to be shipped through the warehouse on projections of customer demand that have some factual basis'; (2) 'no processing or substantial product modification of substance occurs at the

warehouse'; (3) 'while in the warehouse, the merchandise is subject to the shipper's control and direction as to the subsequent transportation'; and (4) 'the shipper or consignee must bear the ultimate payment for transportation charges even if the warehouse or distribution center directly pays the transportation charges to the carrier' (this goes to the shipper's responsibility for the original interstate journey). If these conditions are satisfied, the intrastate leg at the end of the shipment should be deemed part of an interstate shipment." *Id*. at 899–900, quoting ICC Policy Statement, *Motor Carrier Interstate Transportation—From Out-of-State Through Warehouses to Points in Same States*, 57 Fed. Reg. 19812 (May 8, 1992).

Applying those criteria to the case at hand, the district court properly held that the routes by the plaintiffs were part of an interstate shipment. The circumstances of the Ford shipments are analogous to that of the wine shipments by Heritage in the *Collins* case discussed above. In both cases, the shipments are intended to be delivered to a destination, but are diverted temporarily to a storage facility so as to allow for a timely delivery when needed at the intended destination. In *Heritage*, we held that the warehouse time did not alter the interstate nature of the shipment, even though the expectations as to the final destination for much of the wine was based on expected market conditions not actual in-hand contracts. Here, the auto parts are intended to be delivered to the Assembly Plant at a time that they are needed by the Assembly Plant, and the temporary diversion to the storage lot, just as the storage of the wine in the warehouse, does not alter the interstate nature of the shipment. The original and persisting intended destination for the shipment was always the Assembly Plant, not the storage lot, and only parts not immediately needed by the Assembly Plant were held temporarily in the

storage lots. The parts are ordered based on expected inventory needs and are generally transported from the storage lots to the Assembly Plant within 2-3 days of arrival at the storage lots. The same criteria as in *Collins* demonstrates the interstate nature of the trips by the shuttle drivers: Ford based its determination of the total volume to be shipped through the storage facility on projections of demand that had some factual basis, as is apparent by the use of the parts within 2-3 days; no processing or product modification occurs at the storage facility; Ford controls the parts while in the storage lots and directs the transportation of the parts to the Assembly Plant; and Ford is responsible for the payments to the drivers.

The plaintiffs challenge that conclusion, however, arguing that the storage lots and the Assembly Plant should be considered to be one destination, referring to it as the "Ford Assembly Campus." They do not attempt to argue that the temporary stop made by some of the interstate carriers at the Assembly Plant before heading to the storage lots completed the journey, but rather assert that the arrival by the interstate carriers at the storage lots ends the interstate journey because the storage lots are part of the Ford Campus just as a stockroom in the back of a retail store is part of a store. In so characterizing the storage lots, they argue that the parts thus arrived at their fixed and intended destination once the interstate carriers arrived at the "Ford Assembly Campus," which includes the storage lots at the many addresses listed above. That argument cannot withstand scrutiny.

First, the parties' stipulated facts in each of the cases consolidated for disposition provide that "[t]he Ford Motor Company ("Ford") assembles vehicles at Ford's Chicago Assembly Plant ("CAP") located at 12600 S. Torrence Avenue, Chicago,

Illinois 60633." Case 1:18-cv-06221 Doc. 189 at 2, #4; Case 1:19-cv-02066, Doc. 135 at 2, #4. That stipulated fact provides a very specific address for the Ford Assembly Plant, and one that does not include locations remote from it such as the storage lots. The stipulated facts also reveal that "Ford uses certain semi-trailer storage lots (the "Ford lots") nearby the CAP, which Ford owns, leases, or otherwise controls, to stage the trailers containing those out of state parts until such time as those parts are needed for use at the CAP." *Id*. at 3, #11. Once again, the stipulated fact recognizes that the storage lots are not a part of the Assembly Plant but are at distinct locations "nearby" the Assembly Plant. Nothing in those facts supports a characterization of the storage lots as a part of the Assembly Plant. And the list of the addresses of those storage lots makes clear that they are distinct locations. Moreover, the storage lots are not contiguous with the Assembly Plant, and in fact are separated from that plant and each other by miles and can be reached only by traversing public roads. The storage lots are not even all owned by Ford, given the stipulation that the storage lots are owned, leased, or otherwise controlled by Ford. The argument that the storage lots are part of one over-arching Ford Campus rests entirely on the relative geographic proximity of the storage lots to the Assembly Plant, described as a five-mile area around the Assembly Plant, and Ford's use of those lots. But the plaintiffs provide no basis for concluding that the geographic proximity renders the lots and the Assembly Plant one comprehensive destination. In fact, when asked at oral argument whether they would make the same argument whether the lots were 5 miles away or 100 miles away, counsel acknowledged that it would be a harder argument to make if the storage lots were 100 miles away and that such circumstance might reflect more of a warehousing model as

in *Collins*. Their argument would essentially mean that deliveries to any storage lots or warehouses located close to the final destination would be considered delivery to the final destination, even though further transportation by carriers over public roads was needed to complete the delivery to the intended final destination. There is no legal support for drawing such a line, and it would be impractical in application because there would be no standards for identifying how far is too far for such an analysis to apply.

In making that argument that it is part of one campus, the plaintiffs repeatedly rely not on the stipulated facts, but on deposition testimony by Calvin Washington, Ford Material Planning and Logistics Manager, but that testimony does not support their characterization. Doc. 285-2, Case No. 1:18-cv-06221. At best, his testimony demonstrates that when the parts were brought to the storage lots by the interstate carriers, Ford kept a record of the "arrival" of the parts and the storage lot location at which they were stored. That would be expected for any stop in which goods are temporarily stored at a warehouse or storage facility. And the same deponent made clear that the "arrived" designation simply meant that the goods were physically at that location, and that Ford did not record the parts as being in "actual possession" until they were unloaded at the Assembly Plant at Torrence Avenue. *Id.* at 96–97, 113. He even testified that until they unload the trailer and take possession at the Assembly Plant, the goods are in the carrier's hands and the responsibility of the carrier. *Id.* at 109–111. In short, nothing in that document can establish the storage lots as part of the Assembly Plant such that delivery to the intended destination of the Assembly Plant would be completed upon arrival at the lots.

In summary, the storage lots are at locations geographically distinct from the final destination for the products – the Assembly Plant – and the parts can only be transported to the Assembly Plant from those storage lots by traveling over public roads, thus allowing the Department of Transportation to have authority over the transport. There is no additional distance requirement in the law that would alter the legal status, and the claim that it is all one campus is not factually supported. As was true of the deliveries of the warehoused goods in *Collins*, the transportation by the shuttle drivers to and from the storage lots is a part of the interstate shipment of the parts from the out-of-state manufacturing plants to the Assembly Plant. Similarly, the shipment of the empty custom containers from the Assembly Plant to the storage lots by the shuttle drivers, where an interstate carrier retrieves them and transports them back to the manufacturing plants for reuse in the next cycle, is part of an interstate shipment, because from the moment the empty containers leave the Assembly Plant, the intended destination is clearly the out-of-state manufacturing plant.

Accordingly, the district court properly granted summary judgment in favor of the defendants in each of the cases. The decision of the district court is AFFIRMED.